**In re OCEAN PETROLEUM, INC., Debtor.**

**Fleet Bank, N.A., Plaintiff,**

v.

**Business Alliance Capital Corp., Defendant.**

**Bankruptcy No. 898–91840–478.
Adversary No. 899–8174–478.**

United States Bankruptcy Court, E.D. New York.

Aug. 23, 2000.

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, White Plains, NY, for plaintiff.

Lowenstein Sandler, P.C., Roseland, NJ, for Business Alliance Capital Corp.

## *DECISION AND ORDER*

DOROTHY EISENBERG, Bankruptcy Judge.

Fleet Bank N.A. ("Fleet") brought this adversary proceeding to recover a sum of money from Business Alliance Credit Corp. ("BACC") who provided revolving credit and asset-based lending to the Chapter 7 Debtor, Ocean Petroleum Corp. (the "Debtor"). In its complaint, Fleet claims that it mistakenly paid BACC in connection with a series of Automated Clearing House debit transactions initiated by BACC against a Fleet deposit account established by the Debtor for the benefit of BACC.

Fleet has moved for summary judgment claiming that the equitable doctrine of mistaken payment requires BACC to return the sum of money that was mistakenly

paid to it. BACC cross-moved for summary judgment on the grounds that the rules of the National Automated Clearing House Association ("NACHA"), the organization through which the subject transactions were processed, barred such an action. Oral argument on the motion and cross-motion was held on July 5, 2000.

The Court has jurisdiction over the proceeding pursuant to 11 U.S.C. § 1334. Although this action is not a core proceeding under 28 U.S.C. § 157, the parties have consented to the entry of final orders and judgments herein by the Bankruptcy Court. This decision constitutes the Court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(c) as made applicable herein by Fed.R.Bankr.P. 7052.

### FACTS

BACC is a Delaware corporation engaged in the business of providing revolving credit and asset-based lending to businesses in exchange for a security interest in their assets, including inventory and accounts receivable.

Fleet is a national banking association with its principal place of business in Jersey City, New Jersey.

On May 8, 1996, BACC entered into a Loan and Security Agreement with the Debtor pursuant to which BACC agreed to provide the Debtor with a revolving line of credit secured by the Debtor's accounts receivable and other collateral. Under the Loan Agreement, the Debtor was entitled to receive advances from BACC, not exceeding its credit line. On September 1, 1998, the Debtor's available line of credit was $2,000,000.00.

In order to implement this borrowing arrangement, the Debtor and BACC entered into an agreement ("the Blocked Account Agreement") with Fleet Bank whereby a blocked deposit account ("the Blocked Account") was created in the name of the Debtor but solely for the benefit of and exclusively controlled by BACC. The Debtor made payments to BACC under the revolving line of credit by depositing its collections into the Blocked Account pursuant to the Blocked Account Agreement. BACC would then initiate Automated Clearing House ("ACH") debit transfers and wire transfers from the Blocked Account so that it could transfer the money to its own accounts as it saw fit. In order to initiate ACH debit transfers, BACC had a direct computer link with its Bank, Meridian (which subsequently merged with CoreStates and then merged with First Union) so that BACC could initiate a debit request from Fleet, through First Union, directly from a PC in its office.

In a typical transaction, the Debtor prepared a Borrowing Base Certificate in order to request an advance against its credit line from BACC. This statement set forth the Debtor's alleged sales, its collections and a calculation as to its eligibility and availability under the credit line so as to justify a request for an advance. Historically, the Debtor prepared a Borrowing Base Certificate and requested an advance nearly every day.

The certification as to the Debtor's collections on the Borrowing Base Certificate was critically important to BACC as the Debtor was supposed to have deposited these collections directly into the Blocked Account. Relying upon the Debtor's Borrowing Base Certificate and the representations as to deposits made therein, BACC chose to routinely wire advances to the Debtor despite the fact that it would be unable to verify that such deposits had actually been made until the next business day.

On the next business day, the Debtor would forward to BACC a statement produced by Fleet known as the Fleet AM Fax which listed all of the Debtor's deposits made into the Blocked Account during the previous business day. The AM Fax reported all deposits made on a given day under the heading of "Ending Balance." It also clearly and unequivocally reported an "Available Balance" reflecting that por-

tion of the funds in the ending balance which had actually cleared and had been collected. It also clearly listed the dollar amount of "Funds Pending" which reflected the dollar amount of funds that had been deposited into the account by the Debtor but had not actually been cleared and collected. Nevertheless, BACC would initiate ACH debit requests from the Blocked Account based upon the Ending Balance as reported on the Fleet AM Fax.

In the two-week period prior to the Debtor's bankruptcy filing, BACC was unable to initiate ACH debit transfers from the Blocked Account due to complications with its own bank, First Union. Notwithstanding BACC's inability to withdraw from the Blocked Account, it continued to make advances to the Debtor in the amount of $6,071,000.00 based upon the Debtor's representations in its Borrowing Base Certificates that it had deposited $6,091,789.41. On Friday, November 20, 1998, the date of the Debtor's bankruptcy filing, BACC advanced to the Debtor an additional $550,000.00 in reliance upon $597,194.78 reported by the Debtor in its November 20, 1998 Borrowing Base Certificate.

On the same day the Fleet AM Fax showed the Ending Balance in the Blocked Account as $6,089,486.16, the available balance as $5,305,062.16, and Funds Pending in the account as $784,424.00. Based on this figure, and BACC's renewed ability to withdraw from the account, BACC initiated a $5.8 million ACH transfer from the Blocked Account through its bank First Union.

On Monday, November 23, 1998, the $5.8 million ACH debit initiated by BACC was settled at the Federal Reserve Bank which charged Fleet's account to the credit of First Union. On the same day, the $5.8 million was posted as a debit to the Debtor's Blocked Account by Fleet. However, on that date the Blocked Account at Fleet had uncollected and/or insufficient funds available to cover the $5.8 million ACH debit request by BACC. Accordingly, on

November 24, 1998 the $5.8 million debit request initiated by BACC was returned as uncollected by Fleet's own system and credited back to the Blocked Account by Fleet as part of the process to return the ACH debit request initiated by BACC. Although the $5.8 million debit should have also been reversed by Fleet through an automatic return file sent to the Federal Reserve, due to a computer glitch related to a computer upgrade taking place at Fleet during the weekend of November 20, 1998, the ACH return was never initiated by Fleet to the Federal Reserve and the transaction was ultimately deemed final at Fleet's Federal Reserve Account and thus became final within the ACH system.

Upon learning of the Debtor's bankruptcy filing on November 23, 1998, BACC initiated an ACH debit transfer in the amount of $800,000.00. On November 24, 1999, BACC affected a wire transfer from the Blocked Account in the amount of $741,000.00. Upon the settlement of these three transactions, BACC received funds into its First Union account totaling $7,341,000.00 despite the fact that there was only $5,934,310.72 in collected funds available for withdrawal. The remaining $1,406,689.28 BACC received were not funds of the Debtor but rather funds from Fleet's own Federal Reserve Account.

Significantly, Robert J. Flynn, the officer handling the Blocked Account on behalf of BACC, testified in his deposition before trial that he knew as early as November 23, 1998 that $516,000 in deposits made by the Debtor on November 20, 1998 had not cleared the Blocked Account.

On December 14, 1998, twenty two days after the $5.8 million debit item had settled, John Dell'Orso of Fleet Bank contacted Steve Caroll of BACC and advised him that the $5.8 million ACH debit item presented for payment on November 20, 1998 should have been returned for insufficient and/or uncollected funds. This was due to the fact that in the days prior to the bankruptcy filing, the Debtor had deposit-

ed checks into the account that did not clear. As a result, the Blocked Account had a deficiency of $1.4 million. Fleet demanded return of the $1.4 million it paid to BACC out of its own Federal Reserve Account, however, BACC declined to return the money.

By motion dated December 23, 1999, Fleet sought to recover $1.4 million from BACC. BACC and Fleet ultimately stipulated to the return of $741,000.00 without prejudice to either parties rights or defenses regarding the remaining $665,-689.28.

On April 14, 2000, Fleet commenced the instant action alleging, *inter alia*, that it was entitled to the return of the $665,689.28 based upon the theories of mistaken payment, restitution and unjust enrichment. BACC answered, claiming Fleet was barred from asserting that it was entitled to the monies paid to BACC since Fleet had failed to timely return the mistaken payment within the two-day deadline for return of a debit item for insufficient funds pursuant NACHA Operating Rule 5.1.2.

### DISCUSSION

The ACH Network is a processing and delivery system that provides for the distribution and settlement of electronic credits and debits among financial institutions. The ACH Network is governed by the NACHA Operating Rules. The NACHA rules define participating institutions in the following manner. An "Originator" is an "entity that agrees to initiate ACH entries into the payment system according to an arrangement with a Receiver." UN-DERSTANDING THE ACH NETWORK: AN ACH PRIMER AT 2. A "Receiver" is a natural person or organization which has authorized an Originator to initiate an ACH entry into the Receiver's account with the RDFI. *Id.* An "RDFI" or Receiving Depository Institution is the Depository Financial Institution that receives ACH entries from the ACH Operator and posts the entries to the accounts of its depositors

(Receivers). *Id.* An Automated Clearing House Operator is the central clearing facility operated by a private organization or a Federal Reserve Bank (FRB) on behalf of DFIs (Depository Financial Institutions), to or from which Participating DFIs transmit or receive ACH entries. *Id.* An "ODFI" or Originating Depository Financial Institution is the institution that receives payment instructions from the Originators and then forwards the entries to the ACH Operator. *Id.* In the transactions at issue BACC was the Originator, the Debtor was the Receiver, Fleet was the RDFI, the Federal Reserve Bank was the ACH Operator and First Union was the ODFI.

NACHA Rule 5.1.2 states in relevant part:

> "[E]ach return entry must be received by the RDFI's ACH Operator by its deposit deadline for the return entry to be made available to the ODFI no later than the opening of business on the second banking day following the Settlement day of the original entry."

NACHA OPERATING RULE 5.1.2. Pursuant to the foregoing, Fleet was required to return the $5.8 million ACH debit transfer initiated by BACC "no later than the opening of business on the second banking day following the Settlement date of the original entry." *Id.*

Fleet admits that it failed to comply with the time limitations set forth in the NACHA rules but contends that based on Rule 6.3, it is not precluded from seeking the return of the money under New York state common law.

Rule 6.3 provides

Effect of Settlement

> Settlement of entries does not preclude a Participating DFI from pursuing any available legal rights or remedies concerning any entry, adjustment entry or return entry including without limitation any right or remedy arising out of a return entry or adjustment entry, trans-

mitted after the time limits established by these rules.

NACHA OPERATING RULE 6.3. Despite the expansive language of Rule 6.3, BACC argues that Fleet may not maintain an action under state common law since allowing it to do so would render the NACHA rules meaningless.

### ISSUES

■ Before this Court may reach the merits of Fleet's mistaken payment claim, it must determine an issue of first impression. Specifically, whether the ACH Rules foreclose a party who has failed to timely request a reverse entry from seeking other relief or put another way, whether NACHA Operating Rule 6.3 allows a participating institution to pursue its remedies under the common law, despite its failure to comply with the deadline set forth in Rule 5.1.2.

A plain meaning interpretation of Rule 6.3 supports the conclusion that Fleet may pursue a common law claim against BACC for the return of the mistaken payment despite the fact that it failed to comply with the two-day deadline for the return of debit entries as set forth in Rule 5.1.2.

Contrary to BACC's assertions, such an interpretation of the NACHA rules does not render them meaningless. On the contrary, the interpretation is consistent with other rules aimed at the settlement of disputes arising out of ACH transactions.

In addition to Rule 6.3, the NACHA Rules and the NACHA Operating Guidelines provide, in numerous instances, for the resolution of disputes regarding ACH transactions outside of the ACH network. For instance, the NACHA rules specifically state that in cases where an ODFI contests a dishonored return and an RDFI disputes the ODFI's protests,

> "an ODFI may not contest a contested dishonored return received by an RDFI by reinstating the entry. *Any further action concerning the dishonored return must be pursued outside of ACH.*" [emphasis supplied]

NACHA OPERATING RULE 5.2.3. *See also,* NACHA OPERATING GUIDELINES, SEC. III, CH. III AT OG 62.

The NACHA Operating Guidelines actually require DFIs, in certain cases, to seek relief outside of the ACH system. The section entitled *Untimely Entries* states, in relevant part:

> "Once an ODFI receives a Contested Dishonored Return for an entry that it claimed was returned late, *that ODFI must look to procedures outside of the ACH system to settle any further dispute with the RDFI.*" [emphasis supplied]

NACHA OPERATING GUIDELINES SEC. III, CH. III, AT OG 65.

In fact, the NACHA Operating Guidelines provide that in cases where an Originator seeks to dishonor an untimely return and fails to utilize the Dishonored Return process as set forth in the NACHA rules, "such failure does not preclude its right to seek recovery against an RDFI outside of the ACH process for a late return" *Id.* at OG 64

Finally, the NACHA Guidelines provide that ACH participants may resolve disputes through its own arbitration procedures. However, arbitration is not mandatory and each member must agree to submit the dispute to arbitration prior to the filing of the complaint. NACHA OPERATING GUIDELINES SEC. IV, CH. V AT OG 105.

A plain meaning interpretation of Rule 6.3 and a reading of other rules regarding the settlement of disputes arising out of ACH transactions, supports the conclusion that the NACHA rules do not prohibit institutions from pursuing rights and remedies arising out of ACH transactions, outside of the NACHA system. Accordingly, this Court finds that Fleet may pursue its common law claim against BACC for the return funds under the theory of mistaken payment.

## FLEET'S COMMON LAW CLAIM

 Under New York law it is well settled that "a party who has made a mistaken payment to another based upon a unilateral mistake of fact may recover the payment unless that payee has changed his position to his detriment in reliance upon the mistaken payment." *National Bank of Canada v. Artex Industr., Inc.,* 627 F.Supp. 610, 614 (S.D.N.Y.1986), quoting *Bank Saderat Iran v. Amin Beydoun, Inc.,* 555 F.Supp. 770, 773 (S.D.N.Y.1983). "[M]oney paid under mistake of fact may be recovered back however negligent that party paying may have been in making the mistake." *Id.* at 614, quoting *Valley Bank of Nevada v. Bank of Commerce,* 74 Misc.2d 195, 343 N.Y.S.2d 191, 194 (1973), *rev'd on other grounds,* 1973 WL 21411 (1973) [citations omitted].

 In the instant case, BACC does not dispute that Fleet paid BACC by mistake. On that fact alone, absent a valid affirmative defense, Fleet is entitled to the return of the mistaken payment. *Id.* at 614.

BACC's main defense to Fleet's mistaken payment claim is that BACC detrimentally relied on Fleet's mistaken payment by making advances to the Debtor from November 6, 1998 – November 20, 1998. BACC claims that in making such advances, it relied on the fact that the Debtor had made deposits into the Blocked Account as confirmed by Fleet's AM Fax. Although the mistaken payment was not credited to BACC's account until November 23, 1998, BACC alleges that based upon the borrowing history between BACC and the Debtor, BACC was required to rely on "the Debtor's Borrowing Base Certificates and the Debtor's promises therein to immediately deposit all of its collections into the Blocked Account," and also to rely on the Fleet AM Fax Ending Balance in deciding whether to make advances to the Debtor. BACC's brief at 31.

BACC's argument defies logic and does not establish that BACC did anything more than rely on the *representations made by the Debtor* that it had made good deposits into the Blocked Account. The Fleet AM Fax, which BACC allegedly relied upon in lending to the Debtor showed an Ending Balance which included all of the deposits that had been made into the Blocked Account. However, the same document clearly and unequivocally reported, an Available Balance reflecting that portion of the funds in the Ending Balance which had actually "cleared" and been collected and the amount of "Funds Pending" which reflected the dollar amount of funds that had been deposited into the account by the Debtor but had not actually been cleared and collected. The fact that BACC chose to rely on the Ending Balance and therefore rely upon the representations of the Debtor that those deposits would eventually clear and be available for withdrawal at a later date, is of no consequence, and cannot be attributed to Fleet's actions.

Furthermore, in the transactions at issue, BACC received all of the funds to which it was entitled. Indeed, BACC received into its accounts all of the funds the Debtor had deposited into the Blocked Account which were ultimately collected. The funds at issue are solely those that were debited from Fleet's own Federal Reserve Account, and BACC has no rightful claim to these funds.

Significantly, the testimony of Robert Flynn, BACC's manager of the Blocked Account demonstrates that BACC knew of the mistaken payment as early as November 23, 1998. Despite this knowledge, BACC chose to remain silent and retain funds which were not the Debtor's while the November 25, 1998 deadline for return of the debit item pursuant to Rule 5.1.2 expired.

This Court finds that BACC did not detrimentally rely on Fleet's mistaken payment and therefore, Fleet is entitled to the return of the remaining balance of its own funds it mistakenly paid to BACC.

### IN RE: INTEREST

 Although Fleet is entitled to the return of the funds mistakenly paid to BACC, this Court finds that Fleet is not entitled to interest on those funds. Whether interest should be included in Fleet's recovery is controlled by New York law. *In re Sabre Shipping Corp.*, 299 F.Supp. 97, 101 (S.D.N.Y.1969). Inasmuch as Fleet's claim based upon mistaken payment is equitable in nature, its claim to pre judgment interest is governed by CPLR 5001(a). *National Bank of Canada v. Artex Industr., Inc.*, 627 F.Supp. 610 (S.D.N.Y.1986). CPLR 5001(a) provides "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y.C.P.L.R. 5001(a). However, where the error on which the mistaken payment is based was the plaintiff's, it is unfair to charge the defendant for the lost interest. *National Bank of Canada*, 627 F.Supp. at 616.

The mistake upon which Fleet's mistaken payment claim is based was clearly and, upon Fleet's admission, its own mistake by failing to timely request a return entry. Accordingly, this Court declines to award pre judgment interest to Fleet.

### CONCLUSION

1. This matter is before the Court pursuant to Fed.R.Civ.P. 56, as made applicable to adversary proceedings by Fed. R.Bankr.P. 7056.

2. Jurisdiction is conferred by 28 U.S.C. § 1334 and although this proceeding is not a core proceeding under 28 U.S.C. § 157, the parties have consented to the entry of final orders and judgments herein by the Bankruptcy Court.

3. The ACH and NACHA rules do not prevent a party from seeking relief under the common law.

4. Fleet is entitled to the return of $665,689.28 from BACC based on the theory of mistaken payment.

5. Fleet is not entitled to pre judgment interest.

6. Fleet's counsel is directed to settle an Order and Judgment in accordance with this decision on seven (7) days notice to all parties having an interest herein.