SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                    )  Arizona Supreme Court
                                     )  No. CV-08-0241-PR
            Plaintiff/Appellant,     )
                                     )  Court of Appeals
            v.                       )  Division One
                                     )  No. 1 CA-CV 07-0178
WESTERN UNION FINANCIAL SERVICES,    )
INC.,                                )  Maricopa County
                                     )  Superior Court
            Defendant/Appellee.      )  No. SW2006-002213
                                     )
                                     )
                                     )  **O P I N I O N**
_____    )

            Appeal from the Superior Court in Maricopa County
                 The Honorable Kenneth L. Fields, Judge
                 The Honorable Brian K. Ishikawa, Judge

                              **REMANDED**
_____

                 Opinion of the Court of Appeals, Division One
                   219 Ariz. 337, 199 P.3d 592 (App. 2008)

                              **VACATED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                   Phoenix
      By  Cameron H. Holmes, Assistant Attorney General
Attorneys for State of Arizona

STEPTOE & JOHNSON LLP                                      Phoenix
      By  Karl M. Tilleman
          Douglas D. Janicik
          Charles G. Cole                          Washington, DC
          Shannen W. Coffin
And

SIDLEY AUSTIN LLP                                  Washington, DC
      By  Carter G. Phillips
Attorneys for Western Union Financial Services, Inc.
_____

**H U R W I T Z**, Justice

¶1      The issue for decision is whether an Arizona court can issue a warrant seizing Western Union money transfers sent from other states to Mexico.  We hold that an Arizona court lacks jurisdiction under the Due Process Clause of the United States Constitution to issue such a warrant.

**I.**

¶2      Western Union Financial Services, Inc. ("Western Union") is a Colorado corporation, whose principal place of business is in that state.  Western Union's primary business, conducted throughout the United States and in more than 195 foreign countries, is person-to-person wire money transfers.  A customer initiates a transfer by paying a Western Union agent the amount to be transferred and a service fee.  The agent enters the information into Western Union's computer system, which assigns a control number to the transaction.  The control number is given to the customer to provide to the intended recipient.  The money is represented in Western Union's computer system as electronic credits.  To receive the money, the intended recipient presents the control number and personal identification at a Western Union office.  The sender may cancel the transfer and receive a refund until the money is paid to a recipient.

2

¶3      This case arises out of the Arizona Attorney General's commendable efforts to curtail human smuggling and narcotics trafficking. Asserting that certain Western Union wire transfers involved proceeds of these crimes, the State has obtained a number of warrants authorizing seizure for forfeiture of various transfers sent to or from Arizona. *See* A.R.S. § 13-2314(G)(3) (2001) (providing that proceeds of racketeering are subject to forfeiture); *see also id.* § 13-2314(C) (authorizing pre-judgment seizure warrant in racketeering cases); *id.* § 13-4310(A) (authorizing issuance of seizure warrant "prior or subsequent to the filing of a notice of pending forfeiture, complaint, indictment or information").

¶4      On September 21, 2006, the State applied to the superior court for the seizure warrant at issue here. An affidavit supporting the warrant application asserted that human smuggling operations based in Mexico most often smuggle immigrants into the United States through Arizona. Once in Arizona, immigrants often are detained by force in secured locations until sponsors (family, friends, or prospective employers) wire money to associates of the smugglers. After payment, the immigrants are released and make their way to destinations in Arizona or elsewhere. Similarly, the affidavit asserted, drugs smuggled into the United States from Mexico

3

often come through Arizona, and Western Union transfers are used to wire some of the proceeds of the ultimate sales.

¶5        The affidavit also alleged that, as a result of the prior seizure of Western Union transfers to and from Arizona, there had been a marked increase in transfers from twenty-eight other states to certain Sonora, Mexico locations and a corresponding decrease in transfers to and from Arizona. The affidavit contended that many of these transfers from other States represented the proceeds of racketeering activities in Arizona. The affidavit did not identify any particular persons, property, or transactions that were specifically related to illegal activities in Arizona, nor did it identify any particular transfer as representing the proceeds of Arizona-based racketeering.

¶6        The superior court issued an ex parte seizure warrant on September 21, 2006. In relevant part, the warrant authorized the State to seize person-to-person wire transfers from twenty-eight states other than Arizona to twenty-six locations in Sonora. When payout of a transfer covered by the warrant was sought at one of the identified Sonora locations, Western Union was required to "(1) stop payment and transfer the funds to a detention account, (2) notify the intended recipient of the detention and provide that person with information to contact the seizing agency, (3) retain the funds, except those released

4

by the seizing agency, in the detention account for twenty-one days after the warrant expired, and (4) convey any remaining detained funds to the clerk of the superior court in Maricopa County upon the expiration of the twenty-one-day period." *State v. Western Union Fin. Servs.*, 219 Ariz. 337, 343-44 ¶ 4, 199 P.3d 592, 598-99 (App. 2008).

¶7  On September 22, 2006, Western Union filed motions to quash the seizure warrant and for a preliminary injunction to prevent the State from seeking similar warrants.[1]  The superior court stayed the warrant pending an evidentiary hearing.  After that hearing, the court granted Western Union's motions, holding that it lacked jurisdiction under the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, to seize transfers originating in other states and directed to recipients in Sonora.  The court also held that the State had not established probable cause that any specific wire transfer involved the proceeds of Arizona racketeering activity and that the warrant violated the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3.

¶8  The court of appeals vacated the superior court's order.  *Western Union*, 219 Ariz. at 343 ¶ 2, 199 P.3d at 598. The court concluded that "if a foreign corporation is subject to

---

[1]  Western Union did not challenge the September 21, 2006 warrant insofar as it involved transfers to or from Arizona.

general in personam jurisdiction in Arizona, its debts can be considered within this state for purposes of in rem jurisdiction." *Id.* at 350 ¶ 28, 199 P.3d at 605 (citations omitted). Because Western Union conceded that it was subject to the general jurisdiction of Arizona courts, the court of appeals held that the superior court could exercise in rem jurisdiction over transfers to Sonora from other states involving the proceeds of Arizona racketeering activities. *Id.* at 351 ¶ 33, 199 P.3d at 606. The court of appeals also held that the seizure warrant did not violate the Fourth Amendment or the Commerce Clause. *Id.* at 362, 366 ¶¶ 69, 84, 199 P.3d at 617, 621.

¶9 Western Union petitioned for review. We granted review on the issues of whether the superior court could constitutionally exercise in rem jurisdiction and whether the warrant violated the Commerce Clause, questions of statewide importance and first impression. *See* ARCAP 23(c). We have jurisdiction pursuant to Article 6, Section 5 of the Arizona Constitution, and A.R.S. § 12-120.24 (2003).

## II.

¶10 We stress at the outset the narrow issue before us. The court of appeals held that the State had not established in personam jurisdiction over any owner or interest holder of any seized transfer. *Western Union*, 219 Ariz. at 346 ¶ 14, 199 P.3d

6

at 601.[2]  The State does not challenge that holding.  Nor does it challenge the court of appeals' conclusion that, because the issue is whether the warrant could constitutionally authorize seizure of the money transfers, the case before us involves only the exercise of in rem jurisdiction.  *See id.* 346, 348 ¶¶ 14, 21, 199 P.3d at 601, 603.

¶11     The question today is therefore not whether the State can exercise in personam jurisdiction over Western Union. Because Western Union does not dispute that its activities in this state allow the exercise of general jurisdiction, *id.* at 346 ¶ 15, 199 P.3d at 601, the Due Process Clause permits the corporation to be sued in personam in Arizona for any reason. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  Thus, the Fourteenth Amendment poses no bar to an Arizona court, after an appropriate showing, issuing in personam orders to Western Union governing the disposition of wire transfers involving the proceeds of racketeering conducted in this state.  *See also* A.R.S. § 13-2314(C) (authorizing

---

[2]     Under A.R.S. § 13-4301(5), an "owner" is defined as "a person who is not a secured party . . . and who has an interest in property, whether legal or equitable.  A person who holds property for the benefit of or as an agent or nominee for another is not an owner."  An "interest holder" is "a person in whose favor there is a security interest or who is the beneficiary of a perfected encumbrance pertaining to an interest in property."  *Id.* § 13-4301(4).  Western Union does not satisfy either statutory definition.

various orders before determination of liability in forfeiture actions).[3]

¶12    The issue before us is instead whether the superior court can properly exercise in rem jurisdiction over Western Union money transfers originating in other states and directed to Sonora, Mexico.  It is to that issue that we therefore turn.

**A.**

¶13    The Supreme Court has long recognized that "principles of interstate federalism" dictate limits on the exercise of state court jurisdiction.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980); *see also id.* ("The sovereignty of each State . . . implied a limitation on the sovereignty of all of its sister States – a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment.").  The traditional framework for determining the constitutionality of the exercise of jurisdiction over persons and things was set forth in *Pennoyer v. Neff*, 95 U.S. 714 (1877).  *Pennoyer* held that state courts are constrained in exercising jurisdiction by the Due Process Clause of the Fourteenth Amendment and adopted a distinctly territorial approach to establish the constitutional limits.

---

[3]    We also do not today address the power of the Attorney General, upon an appropriate showing, to obtain information from Western Union concerning wire transfers allegedly arising from racketeering activities.  *See State ex rel. Goddard v. W. Union Fin. Servs., Inc.*, 216 Ariz. 361, 166 P.3d 916 (App. 2007).

The central inquiry under *Pennoyer* effectively was "Is it there?"  In other words, the Court asked whether the defendant or property over which jurisdiction was sought was within the territorial boundaries of the state.  *Id.* at 722 ("[N]o State can exercise direct jurisdiction and authority over persons or property without its territory.").  *Pennoyer* also sanctioned the exercise of "quasi in rem" jurisdiction, under which the in-state property of a defendant could be seized to establish jurisdiction, allowing a plaintiff thereafter to pursue his claim against the defendant to the extent of the value of the property.  *Id.* at 723.

¶14     In *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Court expanded the inquiry, and the reach of state jurisdiction, to a broader question: "Is it fair?" *International Shoe* held that the Due Process Clause is not offended by the exercise of personal jurisdiction over a corporate defendant that, although not domiciled in the forum state, has "sufficient contacts" with that state "to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which [defendant] has incurred there."  *Id*. at 320.  *International Shoe*'s now familiar "minimum contacts" test thus allows a state to exercise so-called specific jurisdiction over a defendant not present in the forum for causes of action

9

arising from its contacts with the forum. *Id.* at 317.[4]
*International Shoe* also contemplated that a state could exercise
general jurisdiction over a corporate defendant whose
"continuous corporate operations within a state [are] so
substantial and of such a nature as to justify suit against it
on causes of action arising from dealings entirely distinct from
those activities." *Id.* at 318; *see Helicopteros Nacionales*, 466
U.S. at 414 ("Even when the cause of action does not arise out
of or relate to the foreign corporation's activities in the
forum State, due process is not offended by a State's subjecting
the corporation to its in personam jurisdiction when there are
sufficient contacts between the State and the foreign
corporation.").

¶15     *International Shoe* and the cases immediately following
it addressed only in personam jurisdiction. Thus, the sole
constitutional issue when a state sought to exercise either in
rem or quasi in rem jurisdiction continued to be the one posed
by *Pennoyer*: Was the relevant property within the jurisdiction
of the state? *See, e.g.*, *Hanson v. Denckla*, 357 U.S. 235, 246
(1958) (holding that "[t]he basis of [in rem] jurisdiction is
the presence of the subject property within the territorial

---

[4]     *International Shoe* involved a corporate defendant. It has
long been clear, however, that the minimum contacts analysis for
specific jurisdiction also applies to individual defendants.
*See Shaffer v. Heitner*, 433 U.S. 186, 204 n.19 (1977); *McGee v.
Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957).

jurisdiction of the forum State"). The hoary doctrine of *Harris v. Balk*, 198 U.S. 215 (1905), was thus left intact. *Harris* arose out of a debt from Harris to Balk; Balk in turn owed money to Epstein. Harris lived in North Carolina, Epstein in Maryland. When Harris travelled to Maryland, Epstein served him with process, and a Maryland court entered a judgment requiring Harris to pay Epstein the money Harris owed to Balk. The Supreme Court upheld the judgment against a due process attack, relying on the fiction that the debt followed the debtor, and therefore concluded that Harris's debt to Balk could be found in Maryland because Harris was served there. *Id.* at 222-23.

¶16    Thus, for some thirty years after *International Shoe*, quasi in rem jurisdiction could still be predicated entirely on the fictional "presence" in the forum state of intangible property. *Shaffer v. Heitner* abandoned that notion. 433 U.S. 186, 212 (1977). Recognizing that an assertion of jurisdiction over a thing is really "jurisdiction over the interests of persons in a thing," *id.* at 207 & n.22, *Shaffer* held that although the location of property could be evaluated as a contact for *International Shoe* purposes, the end question was whether there was jurisdiction over the party against whom the plaintiff ultimately asserted liability, *id.* at 212. *See also Burnham v. Superior Court*, 495 U.S. 604, 621-22 (1990) (plurality opinion) (stating that *Shaffer* held that quasi in rem

11

jurisdiction and in personam jurisdiction "are really one and the same").

¶17      *Shaffer* involved the type of quasi in rem action in which the plaintiff seeks to apply property to satisfy a claim unrelated to the property itself.  *See Shaffer*, 433 U.S. at 199 n.17 (defining "in rem" jurisdiction and two types of "quasi in rem" jurisdiction).  Although stating that the *International Shoe* minimum contacts test would also apply to a true in rem action (a suit involving claims related to the property itself), the Court recognized that "it would be unusual for the State where the property is located not to have jurisdiction," as the location of the property itself would provide the required contacts.  *Id*. at 207-08 & n.24.

## B.

¶18      The court of appeals correctly concluded that the warrant at issue today, which authorizes the seizure of specific property, must be analyzed under principles governing in rem jurisdiction.  *Western Union*, 219 Ariz. at 346, 348 ¶¶ 14, 21, 199 P.3d at 601, 603; *see also State v. Kaufman*, 201 N.W.2d 722, 723 (Iowa 1972) ("Search warrant proceedings are in rem, directed primarily against the property, not the owner.").  The State does not disagree.  The court of appeals also held that courts of this state cannot exercise in rem jurisdiction unless the wire transfers are deemed present within Arizona.  *See*

*Western Union*, 219 Ariz. at 349-50 ¶¶ 27-29, 199 P.3d at 604-05. Again, the State does not disagree. Indeed, the Supreme Court's post-*International Shoe* jurisprudence makes plain that a necessary prerequisite to in rem jurisdiction is the location of the subject property within the forum state. The Court has emphasized that "[t]he basis of the jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State." *Hanson*, 357 U.S. at 246 (citations omitted). The Court concluded in *Hanson* that there could be no in rem jurisdiction when the property – the assets of a trust — was not present in the forum state. *Id.* at 249. It thus reaffirmed a core *Pennoyer* principle: An in rem judgment cannot extend to "property outside the forum state." *Id.* at 250.

¶19    Although limiting the broad application of *Pennoyer* to quasi in rem jurisdiction, *Shaffer* itself did not question the basic requirement that in rem jurisdiction rest on the presence of property in the forum state. Rather, the Court indicated that even if *International Shoe* "minimum contacts" are found, in rem jurisdiction is premised on the presence of the property in the forum. *See Shaffer*, 433 U.S. at 199 ("If jurisdiction is based on the court's power over property *within its territory*, the action is called 'in rem' or 'quasi in rem.'" (emphasis added)). Later Arizona cases are in accord. *See In re Approx. $50,000.00 in U.S. Currency*, 196 Ariz. 626, 629 ¶ 7, 2 P.3d

13

1271, 1274 (App. 2000) (noting that "the superior court typically has in rem jurisdiction over the property or res at issue so long as the property is located in the state"); *see also State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 117 ¶ 45, 60 P.3d 246, 257 (App. 2002) ("[A]n Arizona trial court typically has *in rem* jurisdiction over property that is located in Arizona."); *cf.* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1071 (3d ed. 2008) ("[P]roperty can be used as a jurisdictional basis only if it is physically within the territory of the state in which the federal court is sitting.").

### III.

¶20     We therefore turn to the primary question posed by this case:  Is a money transfer sent from a state other than Arizona to a recipient in Sonora, Mexico located within this state for purposes of in rem jurisdiction?

¶21     As the Supreme Court has noted, although determining the location of "[t]angible property poses no problem . . . the situs of intangibles is often a matter of controversy." *Hanson*, 357 U.S. at 246-47 (citing Fletcher R. Andrews, *Situs of Intangibles in Suits against Non-Resident Claimants*, 49 Yale L.J. 241 (1939)).  When, as here, the intangible property is not embodied in a document, determining its situs in many senses

14

involves a fiction.[5]  "The situs of intangible property is about as intangible a concept as is known to the law."  *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 714 (5th Cir. 1968).

¶22    The State contends that the properties seized here are the electronic credits in the Western Union computers, which it characterizes as a debt from Western Union to the Sonora recipients.  This "debt," the State contends, is located wherever Western Union is subject to jurisdiction.  Because Arizona can exercise general jurisdiction over Western Union, the State concludes that the electronic credits are located here.  This argument, as the State recognizes, rests squarely on the *Harris* fiction – that a debt follows the debtor and is located wherever the debtor can be found.

**A.**

¶23    As a preliminary matter, we question whether the *Harris* analogy is apt.  In that case, Harris had borrowed money and had the contractual obligation to repay this "ordinary debt" to Balk.  *Harris,* 198 U.S. at 221, 223.  Here, Western Union's direct contractual obligation is to the sender; it has promised

---

[5]    *Hanson* involved trust property.  357 U.S. at 247 n.16.  The Court noted that the "stocks, bonds, and notes that make up the corpus of the trust . . . [p]roperly speaking . . . are intangibles that have no 'physical' location.  But their embodiment in documents treated for most purposes as the assets themselves makes them partake of the nature of tangibles."  *Id.* (citation omitted).

15

the sender that it will deliver money to the recipient on proper demand. Moreover, unlike the *Harris* debtor, whose obligation to the creditor was fixed, Western Union's obligation to deliver funds to the Sonoran recipient may be cancelled by the sender at any time before the money is paid out. *See Western Union*, 219 Ariz. at 347 ¶ 16, 199 P.3d at 602.

¶24    As an analytical matter, Western Union's role in the wire transfers is more akin to that of a courier, such as United Parcel Service or Federal Express, who has agreed to deliver a package containing cash sent from Colorado to Mexico. In that circumstance, Arizona courts could not exercise in rem jurisdiction over the package in either Colorado or Mexico, even if the funds in the package represented proceeds of racketeering committed in Arizona and the courier was subject to general Arizona jurisdiction. *Cf. State v. Everett*, 110 Ariz. 429, 431, 520 P.2d 301, 303 (1974) (noting "the general rule of law . . . that a warrant of arrest issued in one state can not be executed outside the boundary of the issuing state"). Similarly, we cannot conclude that the property seized here, although in electronic form, is itself located in Arizona simply because Western Union can be sued here. The technical complexities of

16

the electronic age should not blind courts to the substance of transactions in conducting jurisdictional analyses.[6]

## B.

¶25    Factual distinctions aside, the State concedes that its argument depends on the continued vitality of the *Harris* fiction that an intangible obligation is located for jurisdictional purposes wherever the obligor can be found. The logical result of the State's contention is that Western Union's "debt" to the Sonoran recipient is simultaneously located in every state in which Western Union can be sued.

¶26    The Supreme Court has stated, however, that *Shaffer* "interred the mechanical rule that a creditor's amenability to a *quasi in rem* action travels with his debtor." *World-Wide Volkswagen*, 444 U.S. at 296; *see also id*. (stating that *Shaffer* "abandoned the outworn rule of *Harris v. Balk*, that the interest of a creditor in a debt could be extinguished or otherwise affected by any State having transitory jurisdiction over the debtor"). The court of appeals necessarily construed *Shaffer* narrowly, holding that the *Harris* fiction remained viable to determine the situs of intangible property for purposes of

---

[6]    In *United States v. Daccarett*, a federal appeals court upheld the exercise of in rem jurisdiction in New York by a district court over wire transfers moved from an originating bank to an intermediary bank in New York as a step toward eventual transfer to Colombia. 6 F.3d 37, 54-55 (2d Cir. 1993). In the case before us there is no contention that the wire transfers moved through an Arizona intermediary.

evaluating in rem jurisdiction. *See Western Union*, 219 Ariz. at 350 ¶ 28, 199 P.3d at 605.

¶27 In so concluding, the court of appeals relied on *Rush v. Savchuck*, 444 U.S. 320 (1980). That case involved an automobile accident in Indiana; the plaintiff, an Indiana native, was a passenger in a car driven by another Indiana citizen. The plaintiff brought suit in Minnesota after garnishing the obligation of the driver's insurer, State Farm, which conducted business in every state.

¶28 The Supreme Court held that *Shaffer* barred the assertion of quasi in rem jurisdiction, as the driver had no Minnesota contacts. *Id.* at 328-29. The court rejected the constitutional significance of State Farm's obligation to the insured, stating:

> In fact, the fictitious presence of the insurer's obligation in Minnesota does not, without more, provide a basis for concluding that there is *any* contact in the *International Shoe* sense between Minnesota and the insured. To say that "a debt follows the debtor" is simply to say that intangible property has no actual situs, and a debt may be sued on wherever there is jurisdiction over the debtor. State Farm is "found," in the sense of doing business, in all 50 States and the District of Columbia. Under appellee's theory, the "debt" owed to Rush would be "present" in each of those jurisdictions simultaneously. It is apparent that such a "contact" can have no jurisdictional significance.

*Id.* at 329-30.

18

¶29    The court of appeals read this language as recognizing the "ongoing viability" of the *Harris* fiction and standing for the proposition that "if a foreign corporation is subject to general in personam jurisdiction in Arizona, its debts can be considered within this state for purposes of in rem jurisdiction." *Western Union*, 219 Ariz. at 350 ¶ 28, 199 P.3d at 605.  To the contrary, *Rush* simply recognized the complete constitutional irrelevance of the *Harris* fiction to state assertions of quasi in rem jurisdiction.  Because the only issue in such a case is whether the party against whom the plaintiff seeks to impose ultimate liability is subject to the in personam jurisdiction of the forum, the situs of intangible property unrelated to a plaintiff's claim has no application whatsoever after *Shaffer* to the constitutional analysis.  *Rush* thus simply ignored the *Harris* fiction; it did not approve its use in analyzing in rem jurisdiction.

¶30    The court of appeals also cited *Weitzel v. Weitzel*, 27 Ariz. 117, 230 P. 1106 (1924), for the proposition that a debt owed by a non-Arizona corporation was located here because the corporation was subject to Arizona service.  But *Weitzel* was decided half a century before *Shaffer*, and expressly relied on the *Harris* fiction.  *Id*. at 121, 230 P. at 1107.  Moreover, *Weitzel* involved a post-judgment garnishment.  In such circumstances, the defendant's liability has already been

19

established. The relevant jurisdictional analysis in such cases properly focuses on whether the garnishee is subject to the specific or general jurisdiction of the forum state, not whether the intangible res is located there under the *Harris* fiction. *See State ex rel. Dep't of Rev. v. Control Data Corp.*, 713 P.2d 30, 32 (Or. 1986) (holding, without resort to the *Harris* fiction, that a post-judgment garnishment could reach wages owed to the judgment debtor "in the hands of Control Data, a third party that unquestionably is present in Oregon"); *see also Shaffer*, 433 U.S. at 210 n.36 (stating that "there would seem to be no unfairness" in a state exercising post-judgment jurisdiction to collect a debt even if it would have had no original jurisdiction to determine the debt).[7]

## C.

¶31        It is therefore clear at the very least that the Supreme Court has not mandated the continued use of the *Harris* fiction for the purposes of establishing in rem jurisdiction. But, even assuming that the Court has not completely abandoned the fiction, it surely has not foreclosed us from evaluating the continuing utility of the *Harris* doctrine.

---

[7]     The court of appeals also cited *Levi Strauss & Co. v. Crockett Motor Sales, Inc.*, 739 S.W.2d 157 (Ark. 1987). *Western Union*, 219 Ariz. at 350 ¶ 28, 199 P.3d at 605. But that case also involved a post-judgment garnishment, not a pre-judgment seizure of property to establish in rem jurisdiction. *See Levi Strauss*, 739 S.W.2d at 157.

¶32     We start from the premise that, before *Shaffer*, the *Harris* fiction served a useful purpose, as *International Shoe* left alive the doctrine of quasi in rem jurisdiction. But since *Shaffer*, the *Harris* fiction no longer has any relevance in quasi in rem actions; the focus is now on the defendant's contacts with the forum state. Nor is the fiction necessary, as noted above, to support the exercise of post-judgment garnishment of intangible assets. *See* ¶ 30, *supra*.

¶33     The fiction is also unnecessary after *International Shoe* to allow courts to reach intangible property in the hands of out-of-state defendants. If those with interests in the property are subject to in personam jurisdiction in the forum state, a court in that state undoubtedly has jurisdiction consistent with the Due Process Clause to enter orders relating to the property. *See* ¶ 11, *supra*. Any reason for continued adherence to the *Harris* fiction as a basis for the exercise of in rem jurisdiction has disappeared.

¶34     Rather, when the plaintiff proceeds in rem, "the solution must be sought in the general principles governing jurisdiction over persons and property rather than in an attempt to assign a fictional situs to intangibles." *Atkinson v. Superior Court*, 316 P.2d 960, 964 (Cal. 1957) (Traynor, J.). Courts must focus on reality, not fiction. Under such an analysis, an intangible not embodied in a document is

21

undoubtedly subject to the jurisdiction of the court where its owner is domiciled. *Gravano*, 204 Ariz. at 117 ¶ 45, 60 P.3d at 257 (holding that Gravano's rights under a book contract, "which are intangible property," could be seized in Arizona "because Gravano was a resident here") (citing *Kelly v. Bastedo*, 70 Ariz. 371, 377, 220 P.2d 1069, 1073 (1950)). That principle, however, is of no aid to the State today, as it makes no contention that either the sender or the recipient of the wire transfer is domiciled in Arizona.

¶35    The Supreme Court has expressly pretermitted whether in rem jurisdiction over intangibles not embodied in documents can be exercised in more than one state. *See Hanson*, 357 U.S. at 247. We therefore need not decide today whether the wire transfers are present for constitutional purposes in more than one locale. It might well be reasonable under the circumstances of this case to consider the seized funds as present in the state from which they were sent until they are collected. It might also be reasonable to view the funds as located in Colorado, Western Union's state of incorporation. *Cf. Delaware v. New York*, 507 U.S. 490, 494 (1993) (holding that when owner of unclaimed securities distributions cannot be found, state of domicile of debtor has priority in escheat proceedings); *Pennsylvania v. New York*, 407 U.S. 206, 212, 215-16 (1972)

22

(allowing escheat of money orders where the payee's address is unknown in the state of telegraph company's domicile).

¶36      In the end, however, we cannot conclude that a wire transfer originated in another state by someone who has not been shown to be an Arizona resident and directed to a recipient in a foreign country who also has not been shown to be an Arizona resident is "located" in Arizona simply because Western Union, a foreign corporation, is amenable to suit here.   Nor can we conclude that the seized funds are somehow "located" here because they allegedly are in payment for illegal conduct that occurred in this state.   Just as cash paid in another state to a criminal who violated the law in Arizona is not located here for constitutional purposes, other forms of payment that never travel through this state are similarly beyond the reach of a seizure warrant.   We decline to resuscitate the moribund *Harris* fiction as a substitute for reasoned analysis of the situs of the particular intangible at issue, and as the State concedes, that fiction is the essential underpinning of its in rem jurisdictional claim.

### D.

¶37      Our dissenting colleague suggests that we have "built a straw man" on *Harris v. Balk*.   *Infra* ¶ 44.   The contention is passing strange.   Both in this Court and in the court of appeals, *Harris* was the linchpin of the State's jurisdictional

23

argument; indeed, the State admitted at oral argument that its position rested entirely on the *Harris* fiction. The fiction unquestionably was the centerpiece of the conclusion below that the seized funds were located in Arizona for jurisdictional purposes. *See Western Union*, 219 Ariz. at 350 ¶ 28, 199 P.3d at 605 ("[I]f a foreign corporation is subject to general in personam jurisdiction in Arizona, its debts can be considered within this state for purposes of in rem jurisdiction."); *see also id.* at 348 ¶ 22, 199 P.3d at 603 (noting that the State "relied on" *Harris*).

**¶38** Moreover, although ostensibly eschewing reliance on *Harris*, the dissent in reality relies in full force on its outdated fiction. Our dissenting colleague agrees with us that "presence" of the res in Arizona is a "necessary component" of in rem jurisdiction. *Infra* ¶ 48. The dissent then finds that "electronic credits necessarily exist simultaneously in every place they can be instantly received." *Infra* ¶ 52. Because the dissent concludes that the electronic credits at issue here can be received in any place where Western Union maintains an office, it necessarily stands for the proposition that the credits are "present" for in rem purposes wherever Western Union can be found. It would be difficult to think of a better restatement of the *Harris* fiction.

24

**¶39** The dissent argues that because "an intended recipient can go to any Western Union station and instantly receive the money, the funds *must be at that location*, both conceptually and physically." *Infra* ¶ 49. But, even assuming the factual accuracy of the quoted statement,[8] it does not lessen the dissent's reliance on the *Harris* fiction. Western Union does not contest the ability of the State to seize funds demanded by a recipient at an Arizona location. The dissent's argument therefore must be that even if the recipient does not do so, the res is nonetheless found here because he theoretically might have sought payment in Arizona. This is precisely the *Harris* fiction – an intangible debt is present wherever the creditor can find the obligor and demand payment.

**¶40** The dissent also speculates that if Arizona cannot exercise in rem jurisdiction over the electronic credits, no state can. *Infra* ¶ 54. But ironically, this assertion does precisely what the dissent accuses the majority of doing – it "essentially conflates presence, a necessary component of [in

---

[8] The factual premise of this argument is at least subject to question. Western Union vigorously asserted at oral argument and in its briefing, Western Union Financial Services, Inc.'s Supplemental Brief on the Merits at 4, that Sonora-bound transfers are not payable in the United States. The opinion below stated that a recipient of a wire transfer may collect funds "at any WU payout location," *Western Union*, 219 Ariz. at 347 ¶ 16, 199 P.2d at 602, but it is not clear whether this is simply a description of Western Union's general practices and the superior court appears to have made no factual findings on this point.

rem] jurisdiction, and jurisdiction itself." *Infra* ¶ 48. The dissent worries that even if the wire transfers are present for in rem purposes in one or more other states (as we assume, *see* ¶ 35, *supra*), those states may be unable, as *Shaffer* requires, 433 U.S. at 212, to establish that those with interests in the funds have minimum contacts with the forum. But if, as the dissent concedes, presence is a "necessary component" of in rem jurisdiction, that component cannot be ignored simply because another necessary component, the minimum contacts of those with interests in the res, can be established by the forum.

**¶41** More importantly, the dissent's suggestion that law enforcement will be unable to address the problems of human smuggling in the absence of the in rem order at issue in this case finds no support in our opinion or the case law. Because Western Union is subject to the general jurisdiction of Arizona courts, the Due Process Clause is not offended by in personam orders regarding the disposition of the wire transfers shown to constitute proceeds of racketeering conducted in this state. *See* ¶ 11, *supra*. Such orders can assure – as does the order at issue today – that the funds will not be transferred pending the institution of forfeiture proceedings. And, in those subsequent proceedings, whether formally denominated in rem or in personam, the core requirements of the Due Process Clause remain identical – there must be minimum contacts between those with interests in

26

the subject funds and the State of Arizona. *Shaffer*, 433 U.S. at 212; *see also* A.R.S. § 13-4302 (authorizing forfeiture proceedings "if the property for which forfeiture is sought is within this state at the time of the filing of the action or if the courts of this state have in personam jurisdiction of an owner or interest holder in the property").

¶42      In short, despite our dissenting colleague's reservations, our opinion establishes only that Western Union wire transfers initiated in another state and directed to recipients in Mexico are not "present" in Arizona for in rem jurisdictional purposes.  However noble the State's purposes, in rem jurisdiction requires presence of the subject property in this State, and we hold today only that we can no longer accept the *Harris* fiction as the basis for finding that presence.

## IV.

¶43      For the reasons above, we hold that the superior court could not exercise in rem jurisdiction over Western Union money transfers from senders in states other than Arizona to recipients in Mexico.[9]  We therefore vacate the opinion of the court of appeals and remand to the superior court for further proceedings consistent with this opinion.

---

[9]  We thus need not consider whether it would be reasonable to exercise jurisdiction over those with alleged interests in the seized transfers.  We also therefore decline to consider Western Union's Commerce Clause arguments.

27

_____
                Andrew D. Hurwitz, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice


**E S P I N O S A**, Judge, dissenting

¶44      I respectfully dissent because, in my view, the majority has painstakingly built a straw man on the bleached bones of *Harris v. Balk*, and then knocked it down, without addressing what I believe is the true issue at hand. In doing so, the court avoids grappling with the key feature of the jurisdictional question presented: the implication of a relatively new species of intangible property that has no singular location. Contrary to the majority's characterization, this type of property has virtually nothing in common with "a package" that a "courier, such as United Parcel Service or Federal Express," has agreed to deliver; thus, traditional, in-

28

rem-jurisdiction analysis does not readily apply. The very term "electronic credit" illustrates the problem because it aptly describes the abstraction that is at the heart of the transactions and wire transfers involved here. If a Western Union wire transfer, which consists of electronic credits created by the payment of money at a sending location, cannot be found, in both a conceptual and practical sense, wherever Western Union does business and routinely pays out on such transfers, then it is nowhere to be found, because, in Western Union's global, computerized accounting system, these electronic credits have no more "location" than does an e-mail message once the "send" button is clicked. The majority, however, sidesteps this modern reality, saying, "The technical complexities of the electronic age should not blind courts to the substance of transactions in conducting jurisdictional analyses." Unfortunately, in my opinion, the majority has turned a blind eye to the true nature of the issue here.

¶**45** As the majority acknowledges, intangible property does not have a clearly defined or easily ascertainable situs. *See Hanson*, 357 U.S. at 246-47; *Tabacalera Severiano Jorge*, 392 F.2d at 714. In addressing this problem, the majority cogently summarizes portions of the evolution of jurisdiction jurisprudence and then focuses on *Harris*, stating that the issue here "rests squarely on the *Harris* fiction" and questioning

whether it is analogous to this case. I agree that *Harris* is not applicable here, but for different reasons than those provided by the majority.

**¶46** Initially distinguishing *Harris* as involving an "ordinary debt," the majority points out that Western Union's obligation is to the sender, who can cancel the obligation up until the time the money is paid to the recipient. But this is a distinction without a difference in terms of the location of Western Union's electronic credits. Although a transaction may be subject to cancellation by the sender, absent such a presumably rare occurrence, Western Union has a contractual obligation to pay out the money being transferred. More importantly, *Harris* is not "apt" here because it held that quasi in rem jurisdiction could be premised on nothing more than the transitory presence of a debtor and his debt to an unrelated third party. That is the "mechanical rule" soundly rejected by the Supreme Court in *World-Wide Volkswagen* and *Shaffer*. 444 U.S. at 296; 433 U.S. at 208-09. But, contrary to the implications of the majority opinion, the Court has never overruled or disavowed the underpinning of *Harris* – the common law doctrine that the legal situs of an intangible obligation is the situs of the obligor.[10] Rather, the Court has simply pointed

---

[10] Case law from past to present acknowledges the proposition that a debt is located with the debtor. *See, e.g., Chicago,*

30

out the due process problems with attempting to ground jurisdiction over individuals on nothing more than the theoretical location of a debt. *See Shaffer*, 433 U.S. at 209 ("In such cases, if a direct assertion of personal jurisdiction over the defendant would violate the Constitution, it would seem that an indirect assertion of that jurisdiction should be equally impermissible."); *see also Rush*, 444 U.S. at 328 (in rem jurisdiction may only be exercised when contacts "satisfy the fairness standard of *International Shoe*"). It is clear the only thing the Court "interred" in *World-Wide Volkswagen* was "the mechanical rule that a creditor's amenability to *quasi in rem*

_____

*R.I. & P. Ry. Co. v. Sturm*, 174 U.S. 710, 716-17 (1899) (debts accompany creditor everywhere and are payable everywhere); *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004) (courts consistently hold situs of debt obligation is situs of obligor); *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 570 F. Supp. 870, 879 n.9 (S.D.N.Y. 1983) ("While '*Shaffer* clearly overruled *Harris* on its facts,' '[t]he [Supreme] Court did not indicate total disapproval of *Harris v. Balk*, for it noted that attachment of a debt is proper wherever the debtor is found.'") (internal citations omitted, alterations in *Libra*); *Long v. Baldt*, 464 F. Supp. 269, 273 n.3 (D.S.C. 1979) ("[T]he *Shaffer* decision does not disturb the common law notion that the situs of the debt lies with the debtor."); *Barker v. Smith*, 290 F. Supp. 709, 711-12 (S.D.N.Y. 1968) (corporate debt located where corporation does business); *In re World of English*, *N.V.*, 16 B.R. 817, 819 (Bankr. N.D. Ga. 1982) (situs of account receivable is location of account debtor); *Perez v. Chase Manhattan Bank*, *N.A.*, 463 N.E.2d 5, 8 n.1 (N.Y. 1984) ("Although another aspect of *Harris v. Balk* has been overruled, the debt-situs holding remains unimpaired.") (internal citations omitted); *Beck v. Mfrs. Hanover Trust Co.*, 481 N.Y.S.2d 211, 216 (N.Y. Sup. Ct. 1984) (debt follows debtor); *Poston v. Poston*, 657 A.2d 1076, 1078 (Vt. 1993) (debt has situs in any state corporate debtor may be sued).

action travels with his debtor." 444 U.S. at 296. Stated differently, what has been laid to rest is the use of the debt-follows-the-debtor doctrine as a substitute for due process and minimum contacts analysis when invoking in rem or quasi in rem jurisdiction.

¶47        In *Shaffer*, the Court noted:

> "The Fourteenth Amendment did not, in guaranteeing due process of law, abridge the jurisdiction which a State possessed over property within its borders, regardless of the residence or presence of the owner. That jurisdiction extends alike to tangible and to intangible property. Indebtedness due from a resident to a non-resident of which bank deposits are an example is property within the State. *Chicago, Rock Island & Pacific Ry. Co. v. Sturm*, 174 U.S. 710, 19 S. Ct. 797, 43 L. Ed. 1144. It is, indeed, the species of property which courts of the several States have most frequently applied in satisfaction of the obligations of absent debtors. *Harris v. Balk*, 198 U.S. 215, 25 S. Ct. 625, 49 L. Ed. 1023. . . . [G]arnishment or foreign attachment is a proceeding quasi in rem. *Freeman v. Alderson*, 119 U.S. 185, 187, 7 S. Ct. 165, 30 L. Ed. 372, 373. The thing belonging to the absent defendant is seized and applied to the satisfaction of his obligation. The Federal Constitution presents no obstacle to the full exercise of this power."

433 U.S. at 211 n.38, *quoting Pennington v. Fourth Nat'l Bank*, 243 U.S. 269, 271 (1917); *see also Burnham*, 495 U.S. at 620 (*Shaffer* stands for "nothing more than the proposition that when the 'minimum contact' that is a substitute for physical presence consists of property ownership it must, like other minimum contacts, be related to the litigation").

32

¶48     I believe the majority's failure to make this distinction essentially conflates presence, a necessary component of jurisdiction, and jurisdiction itself. That approach is useful in linking the property seizure at hand to the precipitous fall of *Harris*, but this only distracts from a realistic view of the nature and situs of the res at issue. *See Dickstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 685 A.2d 943, 948 & n.5 (N.J. Super. Ct. App. Div. 1996) (question of state's power to assert jurisdiction over trust account irrelevant to identifying account's situs). Western Union contracts with senders to transmit – in actuality, to make available – specified funds to remote receivers. The resulting electronic credits are thus conceptually and pragmatically debts or obligations while on the books of Western Union before they are paid out. *Cf. Universal Mktg. & Entm't, Inc. v. Bank One of Ariz., N.A.*, 203 Ariz. 266, & 7, 53 P.3d 191, 193 (App. 2002) (money deposited in account creates debt bank owes customer). To say they are not only exalts form over substance. Whether specific obligations, in the form of electronic credits, are subject to Arizona forfeiture jurisdiction is a related but different issue that does not depend on the antiquated holding of *Harris*.

¶49     The majority's assertion that my analysis "in reality relies in full force on [*Harris*'s] outdated fiction" only

33

compounds what I see as its needless fixation on that case, notwithstanding the State's arguably making *Harris* the fulcrum of its jurisdiction arguments. No "fiction" at all is needed to see that, if an intended receiver of funds can go to any Western Union station and instantly receive the money, the funds *must be at that location*, both conceptually and physically. That the electronic credits are therefore present "in any place where Western Union maintains an office," if that is congruent with any location where the funds can be disbursed, is simply a fact of this modern business practice that has nothing to do with *Harris* or the minimum contacts doctrine that overwrote its jurisdictional holding. The majority's insistence to the contrary simply underlines its narrow view of the unique res at issue, and appears to overlook that the flaw in *Harris* is not its debt-follows-the-debtor underpinning but the exercise of jurisdiction on that basis alone "without more." *Rush*, 444 U.S. at 329. That is not the situation here.

¶50 At this point it is useful to revisit some of the underlying facts of this case, particularly those surrounding the deplorable business of human smuggling. After depositing human cargo at a "stash house" in Arizona, a "coyote" demands payment from the hostage's relatives or sponsor in another state. The coyote directs those persons to send the required payment by Western Union wire transfer to a specified accomplice

34

outside Arizona – in this case, at one of several northern Mexico border towns. The payment is made to a Western Union office either in person, by telephone, or over the Internet, and that office makes the specified sum of money available at the desired remote location. That location can be any one of thousands of similar locations throughout the nation, hemisphere, and, indeed, nearly the entire world. Although Western Union claimed otherwise before this court, in its own affidavit provided to both the trial court and the court of appeals, it stated:

> Unlike many other money transmitters, Western Union's money transfer service is provided on a "will call" basis, which means that the sender can identify the receiver of a transaction without having to specify the exact agent location at which the recipient will pick up the transferred funds. Instead, the receiver goes to any convenient Western Union agent location of his or her choosing. The agent uses a control number and other verifying information to identify the transmitted funds and then pays the receiver.[11]

¶51    No cash, currency, check, note, or bank draft of any sort is sent, transported, or routed through any geographic channels between the sender and receiver. Instead, an entry is keyed into the Western Union computer system, identifying the

---

[11]    No facts in the record demonstrate that this is not true for money transfers involving Mexico. And neither Western Union's "Dinero in Minutos" program information submitted below nor its sample consumer "SEND" form, which includes a full page of fine-print "Terms and Conditions" in both English and Spanish, advises senders the money can only be picked up in Mexico.

35

transaction and communicating to any and all other Western Union locations and remote agents authorization to pay to a designated receiver a specified amount of money under certain circumstances. Although typically a location is specified, one is not necessarily required. The payout readily can be made anywhere in the nation or world where Western Union maintains its branches or agents, and thousands of such transactions routinely occur daily. As noted above, the transmitted funds within Western Union's system are referred to as "electronic credits,"[12] which, at bottom, are simply internal communications that Western Union relies on to make this unique type of business transaction possible and advantageous in a modern, Internet-era, global financial system. *See* Joseph H. Sommer, *Where is a Bank Account?* 57 MD. L. REV. 1, 7 (1998) (modern financial transactions nothing more than communications).

¶52 The relevance of this real-world situation to the present legal issue is that, simply stated, electronic credits have no actual physical location once they are created in Western Union's computer system. Instead, just like e-mail

---

[12] This term is not unique to the business of money transfers and is commonly used in the banking industry as well. *See, e.g.*, *In re Ocean Petroleum, Inc.*, 252 B.R. 25, 29 (Bankr. E.D.N.Y. 2000) (automated clearinghouses distribute and settle "electronic credits and debits among financial institutions"); *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 194 (N.Y. 1991) (wire transfers process funds through wire payment systems).

communications whose receipt is not limited to any particular location or computer, such electronic credits necessarily exist simultaneously in every place they can be instantly received. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 851 (1997) ("cyberspace," in which e-mail exists, is "a unique medium . . . located in no particular geographical location but available to anyone, anywhere in the world"); *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 590-91 (2002) (Breyer, J., concurring) (describing impossibility of confining Internet to particular geographical areas); *see also Campbell Pet Co. v. Miale*, 542 F.3d 879, 884 (Fed. Cir. 2008) (Web site information available everywhere, not confined to discrete jurisdiction or exclusively located in any one place).

¶53     The majority points out that the logical implication of locating a debt anywhere the debtor can be found is that the electronic credits are "simultaneously located in every state in which Western Union can be sued."[13]   It then reasons, "The Supreme Court has squarely stated, however, that *Shaffer*

---

[13]    Although the majority quotes a passage from *Rush* in which the Supreme Court stated that the multijurisdictional situs of an intangible obligation "can have no jurisdictional significance," the implication of this language is not that multijurisdictional situs is impossible or improper. *See Rush*, 444 U.S. at 329-30.  Rather, the Court was emphasizing that mere presence is not a factor establishing minimum contacts when the res exists in every state. *See Shaffer*, 433 U.S. at 209 ("the presence of the defendant's property in a State might suggest the existence of other ties").

'interred the mechanical rule that a creditor's amenability to a quasi in rem action travels with his debtor,'" citing *World-Wide Volkswagen*, 444 U.S. at 296. But acknowledging that in rem jurisdiction cannot be premised solely on the situs of a debt does not explain why multijurisdictional situs is factually or legally untenable. *See Tabacalera Severiano Jorge*, 392 F.2d at 714-15 (acknowledging intangible property may have legal situs in multiple places). The notion that intangible electronic credits are present anywhere they can be redeemed is neither outlandish nor troublesome, as the majority suggests. It relates only to the situs of the credits and does not, in the case of a company with multistate presence, automatically or "mechanically," create jurisdiction in every state in which the credits can be said to exist. *Cf. Rush*, 444 U.S. at 329 (mere presence of State Farm's obligation to insured, which can be said to exist in every state where State Farm does business, insufficient basis for in rem jurisdiction absent meaningful contacts with the forum state; insurance policy "not the subject matter of the case . . . nor . . . related to the operative facts of the . . . action").

¶54      After *Shaffer* and its progeny, not every state – indeed, perhaps no other state but Arizona – could exercise in rem jurisdiction over the property involved in this case. *See Shaffer*, 433 U.S. at 208-09 (absent showing of additional ties

supporting jurisdiction beyond mere presence of property in state, jurisdiction unconstitutional). Only Arizona can arguably satisfy the minimum contacts requirements of *International Shoe* and *Shaffer* because the wire-transferred payments are at the very heart of the litigation here. Although refraining from assigning a location to this res, the majority surmises it might be located either in the states in which the money transfers originated or in Colorado, Western Union's state of incorporation. But to find that jurisdiction exists in those states would require application of the "mechanical rule" proscribed by *Shaffer*. If one accepts that Western Union's ubiquitous electronic credits are somehow more authentically "present" in those states than in Arizona, the exercise of in rem jurisdiction in those forums would be problematic, if not flatly unconstitutional, because the intangible property would lack any meaningful contact with those jurisdictions. *See id.* at 208-09 (where property within forum unrelated to cause of action, insufficient basis for jurisdiction).

¶55     Smugglers cross the border into Arizona, deposit their cargo in Arizona, demand or arrange for payment for their services while in Arizona, and hold the smuggled immigrants or drugs in Arizona until payment is received. The only facet of these particular enterprises occurring elsewhere is the initiation of payment from another state. This limited

39

participation in the remote forum, involving relatively attenuated and sometimes innocuous conduct, would likely be insufficient to establish the requisite contacts to assert or sustain jurisdiction over the res in those states. *See Helicopteros Nacionales*, 466 U.S. at 418 ("mere purchases" insufficient to satisfy minimum contacts standard of *International Shoe*). And, in the wake of *Shaffer*, Colorado's exercise of jurisdiction over the res necessarily would be unconstitutional because it would rest solely on the presence of the intangible property in Western Union's state of incorporation. *See Shaffer*, 433 U.S. at 208-09. Accordingly, the majority's decision could effectively render the electronic credits generated by criminal conduct in our state legally untouchable; if Arizona may not assert jurisdiction over them, it is likely no state could.[14]

---

[14] The majority deflects this concern, citing A.R.S. §§ 13-4302 and 13-2314(C) and suggesting Arizona could exert general in personam jurisdiction to prevent Western Union from distributing funds identified as proceeds of racketeering. But that precise theory was not raised or briefed by the parties and may not be a viable option. On its face, § 13-4302 authorizes in rem jurisdiction over "property . . . within th[e] state" and expressly limits in personam jurisdiction to an "owner of or interest holder in the property." Section 13-2314(C) allows pre-liability orders only over property "subject to forfeiture" which presumably means as governed by § 13-4302. It would appear the state could never meet this burden with regard to Western Union's electronic credits because the majority denies both that they exist in Arizona and that Western Union is either an owner or an interest-holder of this property. *See supra* n.2; *see also Gravano*, 204 Ariz. 106, ¶¶ 42-45, 60 P.3d at 257 (state could

¶56    Although exercising jurisdiction over an intangible res violates due process when "the property which now serves as the basis for state-court jurisdiction is completely unrelated to the . . . cause of action," *Shaffer*, 433 U.S. at 209, "when . . . the property itself [is] the source of the underlying controversy . . . , it would be unusual for the State where the property is located not to have jurisdiction." *Id*. at 207.  *See also Cameco Indus., Inc. v. Mayatrac, S.A.*, 789 F. Supp. 200, 203-04 (D. Md. 1992) (subjecting bank account to quasi in rem jurisdiction when property directly related to in-state activities); *State of Oregon ex rel. Dep't of Rev. v. Control Data Corp.*, 713 P.2d 30, 31-32 (Or. 1986) (*Shaffer* not violated when state seeks to attach property of out-of-state party in care of in-state third party).  In this vein, an eminent jurist long ago observed:

> The situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them.  The locality selected is for some purposes, the domicile of the creditor; for others, the domicile or place of business of the debtor, the place, that is to say, where the obligation was created or was meant to be discharged; for others, any place where the debtor can be found. At the root of the selection is generally a

_____

institute pre-liability forfeiture orders over book royalties when it had in personam jurisdiction over owner); *State v. Henderson,* 149 Ariz. 254, 256, 717 P.2d 933, 935 (App. 1986) (denying jurisdictional challenge where plea agreement included forfeiture of out-of-state real property defendants owned at time of judgment).

41

> common sense appraisal of the requirements of justice
> and convenience in particular conditions.

*Severnoe Sec. Corp. v. London & Lancashire Ins. Co.,* 255 N.Y. 120, 123-24, 174 N.E. 299 (N.Y. 1931) (Cardozo, J.) (citations omitted). The unique intangible property here, while under the exclusive control of Western Union, is necessarily located at every Western Union office where it can be collected at will, including Western Union's offices in Arizona – the forum directly connected to the litigation. The money underlying these electronic credits is payment for drugs or ransom for hostages being held and often abused in clandestine locations in Arizona. The state's overriding interest in this money is the prevention of drug and human smuggling and the attendant violence, degradation, suffering, and economic harm such activities visit on Arizona's communities. Interfering with the powerful financial incentives for committing these crimes is one of the most effective tools there can be. Thus, the property at issue is at the heart of the state's mission in this action. And, if fairness is the touchstone of contemporary jurisdictional jurisprudence, *see Rush*, 444 U.S. at 328; *Shaffer*, 433 U.S. at 205, it is without question fair and concordant with traditional notions of due process to anticipate that the transferred money – and, by extension, its owners – should be subject to the authority of this state's courts, *see*

*Shaffer*, 433 U.S. at 207 (exercise of in rem jurisdiction is jurisdiction over property's owner).

¶57     As the majority notes, "Courts must focus on reality, not fiction." But the majority today avoids the real-world situation presented in this case by applying traditional jurisdictional analysis and sidestepping the novel issues created by evolving technology and ever-adapting criminal methodologies. In so doing, this court misses a compelling opportunity to appropriately advance the law in accord with changing societal needs. *See id*. at 202 (social and technological change drives evolution of jurisdictional analysis); *see also Burnham*, 495 U.S. at 617 (advances in technology, communications, and mobility have broadened scope of state court jurisdiction). Accordingly, I would uphold the jurisdictional ruling of the court of appeals and go on to address the Commerce Clause issue, which I believe was correctly decided as well.

_____
Philip G. Espinosa, Judge[*]

_____

[*]     Vice Chief Justice Berch has recused herself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Philip G. Espinosa, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.