Javier TORRES, Alma Santiago and Lia Rivadeneyra, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Terry GODDARD, Attorney General of the State of Arizona, in his individual and official capacities, and Cameron ("KIP") Holmes, in his individual capacity, Defendants.

No. CV 06-2482-PHX-SMM

United States District Court,
D. Arizona.

Signed 3/30/2010

Filed 3/31/2010

David Daniel Weinzweig, Michael King Goodwin, Office of the Attorney General, Liability Management Section, Phoenix, AZ, Michael H. Hinson, Paul Correa, Office of the Attorney General-Tucson-Liability Mgmt., Tucson, AZ, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

Stephen M. McNamee, United States District Judge

Currently before the Court is Plaintiffs Javier Torres and Lia Rivadeneyra's Motion for Class Certification (Doc. 79) and related Memorandum (Doc. 80). Defendants Terry Goddard and Cameron Holmes filed a Response and Objection to Motion for Class Certification and Request for Hearing (Doc. 92). Plaintiffs later filed a Reply (Doc. 108). After ordering supplemental briefing from the parties on the necessity of a hearing (Docs.149, 151), the Court granted Defendants' request and held an evidentiary hearing regarding class certification on February 25, 2009 (Doc. 155). After careful consideration of the arguments set forth by each party, the Court finds the following.

## FACTUAL BACKGROUND

This case arises out of efforts by the Arizona Attorney General to curtail narcotics smuggling and illegal smuggling of undocumented aliens. Claiming that certain wire money transfers of Western Union Financial Services, Inc. ("Western Union") involved proceeds of these crimes, the state of Arizona obtained a number of warrants authorizing seizure for forfeiture of various transfers sent to Arizona.[1] Since 2004, Defendants Arizona Attorney General Terry Goddard and Assistant Attorney General Cameron Holmes (collectively "Defendants") have seized in excess of $9,000,000 from thousands of people through the United States pursuant to these warrants.

Joshua Karsh, Juliet V. Berger-White, Karyn L. Bass Ehler, Mary M. Rowland, Matthew J. Piers, Christopher J. Wilmes, Kate Schwartz, Hughes Socol Piers Resnick & Dym Limited, Chicago, IL, for Plaintiffs.

1. The efforts by the Arizona Attorney General to decrease human and drug smuggling through the seizure of funds sent through Western Union has spawned litigation in both state and federal court. *See W. Union v. Goddard,* CV 06–2249–PHX–SMM (federal court); *State of Arizona v. W. Union Fin. Servs., Inc.,* CV–08–241–PR (state court).

## I. Issuance of Seizure Warrants

The six warrants being contested here were issued by the Superior Court of the State of Arizona, Maricopa County and then served by Defendants on Western Union on October 12, 2004, March 10, 2005, September 1, 2005, February 16, 2006, March 15, 2006, and September 21, 2006, respectively (Doc. 80, Ex. A–F). Each of the warrants shared certain characteristics, including requiring the seizure of (1) person-to-person transactions, (2) sent from areas outside Arizona, (3) for delivery in Arizona (or in one warrant, Sonora, Mexico), (4) in any amount at or exceeding a threshold level, (5) during the time period the warrant was in effect.

More specifically, the six warrants were as follows:

*October 12, 2004 Warrant (SW2004–001869—Sweep 11):* This warrant seized all $1,000 person-to-person money transfers placed with Western Union outside Arizona and intended to be paid in Arizona between October 20, 2004 and November 2, 2004 (Doc. 80, Ex. A).

*March 10, 2005 Warrant (SW2005–000696—Sweep 12):* This warrant seized all $2,000 person-to-person money transfers placed with Western Union outside of Arizona and intended to be paid in Arizona starting on March 11, 2005 (Doc. 80, Ex. B). The warrant later was modified to include seizure of funds in the amounts of $1,000 and $1,500 and the term was extended through April 22, 2005 (Doc. 80, Ex. B1–B5).

*September 1, 2005 Warrant (SW2005–002529—Sweep 13):* This warrant seized all $600 and $700 person-to-person money transfers placed with Western Union in any of the following states: Tennessee, Georgia, Illinois, New Jersey, New York, North Carolina, South Carolina, and Virginia (Doc. 80, Ex. C). The transfers were intended to be paid in Arizona starting on September 2, 2005. The warrant later was modified to include seizure of funds placed for transmission in Alabama and Florida and the term was extended through September 29, 2005 (Doc. 80, Ex. C1–C3).

*February 16, 2006 Warrant (SW2006–002032—Sweep 15):* This warrant seized all person-to-person money transfers of $500 or more placed with Western Union in any of the following states: Connecticut, Florida, New Jersey, North Carolina, South Carolina, and Virginia (Doc. 80, Ex. D). The transfers were intended to be paid in Arizona starting on February 17, 2006. The warrant later was modified to include seizure of funds placed for transmission in Delaware, Georgia, Maryland, New York, Illinois, and Indiana and the term was extended through March 16, 2006 (Doc. 80, Ex. D1).

*March 15, 2006 Warrant (SW2006–002054—Sweep 18):* This warrant seized all person-to-person money transfers of $500 or more placed with Western Union in any of the following states: Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Maryland, New Jersey, New York, North Carolina, South Carolina, and Virginia (Doc. 80, Ex. E). The transfers were intended to be paid in Arizona starting on March 17, 2006. The warrant later was extended through April 14, 2006 (Doc. 80, Ex. E1).

*September 21, 2006 Warrant (SW2006–002213—Sweep 21):* This warrant seized all person-to-person money transfers of $500 or more placed with Western Union in any of 29 states: California, Arizona, New York, Florida, Illinois, Georgia, New Jersey, North Carolina, Virginia, Tennessee, Maryland, Texas, Nevada, South Carolina, Ohio, Pennsylvania, Washington, Alabama, Indiana, Oregon, Colorado, Minnesota, Utah, Connecticut, Michigan, Massachusetts, Wisconsin, Kentucky, and Delaware (Doc. 80, Ex. F). The transfers were intended to be paid at one of 26 locations in Sonora, Mexico (*Id.*).

### A. Sonora Warrant

The September 21, 2006 warrant, referred to by the parties as the "Sonora warrant," differs from the others in that the money transfers seized were intended for payout in Mexico, rather than Arizona. Unlike the other warrants, this one has been the subject of proceedings in state court as well. After the superior court issued the ex parte seizure warrant on September 21, 2006, Western Union filed a motion to quash the seizure warrant as well as a motion for preliminary

injunction to prevent the State from seeking similar warrants (Doc. 80, Ex. G). The superior court stayed the warrant pending an evidentiary hearing. Following the hearing, the superior court granted both of Western Union's motions and held that it lacked jurisdiction under the due process clause to seize transfers that originated in other states and were directed to recipients outside Arizona (Sonora, Mexico) (Doc. 80, Ex. K). Additionally, the court held that no probable cause was shown that any wire transfer involved the proceeds of Arizona racketeering activity and that the Commerce Clause was violated by the warrants (*Id.*).

The Arizona Court of Appeals vacated the superior court's opinion and held that the superior court could exercise in rem jurisdiction over transfers from states outside Arizona to Sonora that involved Arizona racketeering activities. *State v. W. Union Fin. Servs., Inc.,* 219 Ariz. 337, 367, 199 P.3d 592, 622 (Ct.App.2008), *overruled by State v. W. Union Fin. Servs., Inc.,* 220 Ariz. 567, 208 P.3d 218 (2009). Additionally, the court of appeals held that the Fourth Amendment and Commerce Clause were not violated by the warrants. *Id.*

The Arizona Supreme Court granted review and held that the superior court could not exercise in rem jurisdiction over money transfers from senders outside Arizona to recipients in Mexico. *W. Union,* 220 Ariz. at 567–68, 208 P.3d at 218–19. The court did not address either the probable cause or commerce clause issues. The Court of Appeals' opinion therefore was vacated and the case remanded to the superior court.

## II. Western Union Money Transfers

Western Union's primary business is person-to-person wire money transfers conducted throughout the United States and in over 195 foreign countries. A customer initiates a transfer by visiting a Western Union location and completing a "send" form (Doc. 80, Ex. G, p.8). The sender then provides the Western Union agent with the necessary documentation and pays the agent the amount to be transferred along with a service fee (*Id.*) The agent then enters the information into Western Union's computer system which assigns a unique Money Transfer Control Number ("MTCN") to the transaction (*Id.*).

This MTCN is provided to the sender to give to the intended recipient of the funds (*Id.*). The transaction information is stored by Western Union at a data processing center until the funds are called for payment (*Id.*). To receive the funds, the intended receipt completes a "receive money" form and presents it, together with the MTCN and proper identification, at a Western Union payout location (*Id.* at 10–11). After confirming this information, the agent pays the receiver the amount of money transferred by the sender. (*Id.*) The sender can cancel the transaction and receive a refund up until the money is paid to the receiver (*Id.* at 10).

This normal payout process, however, was interrupted by Defendants' service on Western Union of the six seizure warrants at issue here. For each of the warrants, Defendants prepared the warrant and filed a request for its issuance (*Id.* at 12–13; Doc. 80, Ex. A–F). Upon issuance of a warrant, Defendants served it on Western Union (Doc. 80, Ex. A–F). When the warrant was served, Western Union was required to "hold" all customers' wire transfer transactions meeting the warrant criteria and then pay the funds from the transactions into a detention account (Doc. 80, Ex. F at 3, ¶ 4). From the detention account, the seized funds were next transferred to an account of the Clerk of the Superior Court of the State of Arizona, Maricopa County where the funds were subject to forfeiture (*Id.*).

During the effective dates of the warrant, "on-call representatives" of the Arizona Attorney General's Office (the seizing agency) were available by phone to speak with senders and receivers regarding the seizure of their funds (Doc. 80, Ex. K, pp. 2–3, ¶¶ 3–4). After questioning the sender or receiver about the transaction, the representative determined whether to allow the transaction to be completed (*Id.* at 3, ¶ 4). If no one called regarding a money transfer or the person calling failed to show that the money was for a legal purpose, the money transfer was forfeited (*Id.*). Finally, Defendants instituted forfeiture proceedings and sent notice of pending forfeiture to the intended recipients of the money only (Doc. 80, Ex. I, Kelly Aff.).

### III. Plaintiffs' Class Action

Plaintiffs Javier Torres and Lia Rivade-neyra (collectively "Plaintiffs") are Western Union customers whose money were seized by Defendants pursuant to these warrants. Under Federal Rule of Civil Procedure 23(b)(3), Plaintiffs seek to represent both themselves as well as a class of others send-ers whose funds were subjected to these seizures during the applicable limitations pe-riod (Doc. 80, 5:10–12). Plaintiffs allege that the seizures were done without probable cause, that notice of the seizures as required by due process was not provided, and that the seizures violate the Commerce Clause (*Id.* at 5:12–16). Plaintiffs seek to certify the following class:

> All persons who attempted to send money through a wire transfer company from a location outside of the State of Arizona and which was subjected to a blanket, criteria-based seizure by defendants on or after October 18, 2004.

(*Id.* at 5:28–6:2).[2]

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on October 18, 2006 alleging four claims: (1) Defendants lacked probable cause to believe that the monies seized were the fruits or instrumen-talities of crimes or otherwise subject to for-feiture in violation of the Fourth Amend-ment; (2) the seizure warrants were overly broad on their face in violation of the Fourth Amendment; (3) Defendants failed to give adequate and timely notice that their monies would be seized, as well as failed to provide a prompt post-seizure hearing to contest the seizures, all in violation of due process; and (4) Defendants interfered improperly with interstate and international commerce in vio-lation of the Commerce Clause (Doc. 1, Compl.). Plaintiffs' Complaint was subse-quently amended twice, but the substantive claims remained the same (Doc. 47, 141).[3]

Plaintiffs filed the present Motion for Class Certification on March 14, 2008 (Doc. 79). Defendants filed a Response on April 21, 2008 (Doc. 92), wherein they requested a hearing to "take evidence from a limited number of relevant law enforcement officials concerning the facts supporting the belief that seized transactions were involved in criminal activity" and other evidence relating to the typicality, commonality, and adequacy of representation requirements of Rule 23 (*Id.* at 17). Thereafter, Plaintiffs filed a Reply on May 19, 2008 (Doc. 108).

In light of Defendants' request for an evi-dentiary hearing, the Court ordered the par-ties to submit briefing regarding the need for a hearing on class certification (Doc. 148, 150). Defendants did so on November 21, 2008 (Doc. 149) followed by Plaintiffs on De-cember 12, 2008 (Doc. 151). The Court de-termined that an evidentiary hearing was needed, and one was scheduled for February 25, 2009 (Doc. 154). Following a full-day hearing, the Court took Plaintiffs' class certi-fication motion under advisement (Doc. 155). Subsequently, the parties submitted addition-al briefing to aid the Court (Doc. 164, 166).[4] On July 16, 2009, Plaintiffs also submitted to the Court the decision of the Arizona Su-preme Court in *State of Arizona v. Western Union Financial Services, Inc.*, CV–08–241–PR, that it believed had bearing on the pres-ent suit (Doc. 173). On July 28, 2009, Defen-dants filed a response discussing the rele-vance, if any, of the Arizona Supreme Court's decision to class certification (Doc. 174).

---

**2.** The seizures at issue in this case were made under the authority of six different warrants, as described previously (Doc. 80, Ex. A–F). The three most recently issued warrants (Feb. 16, 2006, March 15, 2006, and Sept. 21, 2006) did not name a single targeted sender or receiver (Doc. 80, Ex. D–F). The earlier three warrants (Oct. 12, 2004, March 10, 2005, and Sept. 1, 2005) authorized seizures both on the basis *either of specific names of senders or receivers or on the basis of the listed criteria without regard to the names of senders or receivers* (Doc. 80, Ex. A–C). With respect to those seizures made under the earlier issued warrants, Plaintiffs state that only those seizures made without regard to

names of senders or receivers are members of the proposed class (Transcript of Evidentiary Hearing ("Tr.") 21:23–22:8). The class has been defined to exclude any sender whose transaction was seized on the basis of a name (*Id.*).

**3.** Plaintiffs have filed a motion to amend their complaint a third time (Doc. 176), and such motion is still pending before the Court.

**4.** On March 25, 2009, Plaintiffs submitted a filing to correct a perceived error in defense testimony offered at the class certification hearing (Doc. 164). Defendants filed a response to Plaintiffs' filing on April 7, 2009 (Doc. 166).

## STANDARD OF REVIEW

The Court has discretion to certify a class, but must exercise its discretion within the framework of Federal Rule of Civil Procedure 23. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir.2001). Class certification is proper when a class satisfies both the criteria laid out in Rule 23(a) and the requirements under one of the subcategories of Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Rule 23(a) of the Federal Rules of Civil Procedure establishes four prerequisites for a class action, commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Amchem*, 521 U.S. at 613, 117 S.Ct. 2231. *Numerosity* requires a class "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). *Commonality* refers to the need for "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). *Typicality* ensures that the "claims or defenses of the representative parties are typical of the claims or defenses of the class" as a whole. Fed. R. Civ. P. 23(a)(3). Finally, *adequacy of representation* is necessary to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Plaintiffs have moved for class certification pursuant to Rule 23(b)(3), which further requires that the Court find (1) that "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The *predominance* inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir.1998) (citation and internal quotation omitted). The *superiority inquiry* "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.* at 1023.

A plaintiff seeking class certification bears the burden of showing that each element of Rule 23 is satisfied. *Doninger v.*

*Pac. N.W. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir.1977). In determining the propriety of a class action, there is "nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *see also Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir.1983) (holding that "it is improper to advance a decision on the merits to the class certification stage"). "[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies [Rule 23]." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975).

In deciding whether to certify a class, the court must take the substantive allegations of the complaint as true. *Id.* at 901 n. 17. In order to "rule on compliance" with Rule 23, a court may consider supplemental material provided by the parties in order to make an informed judgement. *Id.*

## DISCUSSION

Plaintiffs seek to certify a class pursuant to Rule 23(b)(3). Plaintiffs allege that Defendants' seizure of money transfers sent through Western Union violates the Fourth Amendment, Fourteenth Amendment, and Commerce Clause of the U.S. Constitution. Defendants deny these allegations and contend that Plaintiffs cannot meet the requirements for certification.

When deciding whether Plaintiffs have satisfied the requirements of Rule 23(a) and (b), the Court has not undertaken to evaluate Plaintiffs' likelihood of success on the merits of the claims. Rather, the Court has made an "informed judgment," based on the arguments of both parties, the supplemental material provided, and the evidentiary hearing. *Blackie*, 524 F.2d at 901 n. 17. The court finds that Plaintiffs have satisfied the requirements of Rule 23(a) by demonstrating *numerosity, commonality, typicality,* and *adequacy of representation* for the class.

However, the Court finds that Plaintiffs have not satisfied the requirements of Rule 23(b)(3) by demonstrating that questions of law and fact *predominate* and that a class action would be *superior* to other forms of adjudication.

## I. RULE 23(a)

### A. Numerosity

 Rule 23(a)(1) requires that a proposed class is so numerous as to make joinder of all members impracticable. Fed. R. Civ. P. 23(a)(1). First, the party seeking certification must demonstrate whether a class exists. A class definition should be "precise, objective, and presently ascertainable." *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 367 (C.D.Cal.1997) (citation and internal quotation marks omitted). "A class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Id.*

 In their motion, Plaintiffs seek to certify the following class:

All persons who attempted to send money through a wire transfer company from a location outside of the State of Arizona and which was subjected to a blanket, criteria-based seizure by defendants on or after October 18, 2004.

(Doc. 80, 5:28–6:2). Plaintiffs first argue that the members of this proposed class can be ascertained by means of objective criteria (Doc. 164; Tr. 55:5–9). According to Plaintiffs, the names and addresses of class members can be obtained from Western Union's business records (*Id.*). When a sender transfers money through Western Union, he or she is required to provide a name and address on the "send" form used to initiate the transaction. As a result, Western Union has this information readily available. In response, Defendants argue that the information available is incomplete as it often contains only partial addresses, such as including only a city and state without a street name or number (Doc. 166). Additionally, Defendants contend that many senders used false information to identify themselves, and thus, there is no means of knowing whether the information is accurate (Doc. 166; Evidentiary Hearing Transcript

PM ("Tr.PM") 25:19–22). Western Union has a policy of not requiring verifying identification from those individuals sending less than $1,000 (Doc. 166, Ex. A).

The Court finds that the description of the class proposed by Plaintiffs is definite enough so that it is administratively feasible for the court to determine an individual's membership in it. *O'Connor*, 180 F.R.D. at 367. Western Union's business records identify those senders whose money was seized by the State of Arizona. Defendants' concerns regarding the ability to contact everyone in the purported class goes to the issue of notice, rather than to the Rule 23(a) prerequisites for class certification. For classes certified under Rule 23(b)(3), the court is directed to give class members the "best notice that is practicable under the circumstances, including individual notice to all members who can identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Should certain addresses be found to be incomplete, another form of notice, such as publication notice, would need to be used to notify class members. From the spreadsheets submitted by the parties, it appears that the number of incomplete and/or partial addresses is small compared to the total number of senders (Doc. 170).

 In addition to showing that the class is ascertainable, the proponent must establish that the size of the class makes joinder impracticable. " 'Impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964) (quoting *Advertising Specialty Nat. Assn'n v. FTC*, 238 F.2d 108, 119 (1st Cir.1956)). In addition to class size, courts consider other indicia of impracticability, such as the geographic dispersement of class members, the size of individual claims, the financial resources of class members, and the ability of claimants to institute individual suits. *Amone v. Aveiro*, 226 F.R.D. 677, 683 (D.Haw.2005).

 While the number of Plaintiffs is not the deciding factor for numerosity, courts have generally held that large numbers of potential claimants is indicative of joinder

being impracticable. *Immigrant Assistance Project of L.A. County Fed'n of Labor v. I.N.S.*, 306 F.3d 842, 869 (9th Cir.2002) (recognizing that courts have certified classes solely on the basis of the number of class members, even where that number is less than 100). Here, the exact number of Plaintiffs is unknown, but both parties concede that the potential class would number in the thousands (Doc. 80, 8:22–23 ("[T]he class is estimated to include more than 9,000 persons"); Doc. 92, p.7). Defendants have also provided documents indicating a large number of intended *recipients* of the seized funds (*See, e.g.*, Doc. 92, Ex. E). An inference that the number of *senders* of these funds would be similarly large would not be unreasonable. *See Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985) (citing *Grossman v. Waste Mgmt., Inc.*, 589 F.Supp. 395 (N.D.Ill.1984) ("court is entitled to make 'common sense assumptions' in order to support a finding of numerosity")). The Court finds that the sheer number of potential class members would make joinder of Plaintiffs impracticable and satisfy the numerosity requirement. Fed. R. Civ. P. 23(a)(1).

In addition to the size of the class, the Court notes that additional factors are present that would make joinder impracticable. The proposed class is comprised of senders who are spread across the country, whose financial circumstances may prevent them from pursuing individual litigation, and whose claims are likely too small to make individual litigation feasible. Because joinder of all members of the proposed class would be impracticable, the Court finds that the numerosity requirement of Rule 23(a)(1) is met.

### B. Commonality

 In order to satisfy commonality, a plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The plaintiff's necessary showing to satisfy commonality is "minimal" and "less rigorous than the companion requirements of [predominance and superiority]." *Hanlon*, 150 F.3d at 1019–20. Furthermore, commonality can be construed permissively. *Id.* at 1019. "All questions of fact and law need not be common to satisfy the rule." *Id.* A proposed class can show

commonality by "[t]he existence of shared legal issues with divergent factual predicates," or by "a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

 Plaintiffs assert a series of common legal questions, including (1) whether the seizures pursuant to Defendants' warrants were seizures without probable cause; (2) whether the warrants were based on individualized suspicion sufficient to support a seizure under the Fourth Amendment; (3) whether the warrants are general warrants that delegate improper levels of discretion to officers executing the warrants in violation of the Fourth Amendment; (4) whether the seizures impose undue burdens on or interferes with interstate or international commerce in violation of the Commerce Clause; and (5) whether class members were given adequate and timely notice that their money had been seized and an opportunity to dispute the seizure (Doc. 80, 9:15–23).

 Plaintiffs have presented issues which are common to the class as a whole. When questions of law or fact are "applicable in the same manner to each member of the class," litigating those questions at one time in a class action is appropriate. *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Whether or not the "blanket, criteria-based" seizure of money by Defendants violated Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments and the Commerce Clause are questions of law that are common to all members of the class. Class members uniformly claim that their monies were seized by Defendants pursuant to general, criteria-based warrants unsupported by probable cause, without adequate or timely notice of the seizures and without a meaningful opportunity to contest the seizures, and that the seizures interfered with interstate or international commerce.

Defendants assert that class certification is inappropriate in this case because legal interests in the seized funds must be assessed individually (Doc. 92, 8:4–9). That is, they argue that not all class members will be entitled to restitution (*Id.*). They assert that

Plaintiffs could be barred from restitution of seized funds, even if that seizure was unconstitutional, if the funds were being used in furtherance of an illegal activity (*Id.* at 10 (citing *United States v. 20832 Big Rock Drive*, 51 F.3d 1402, 1406 (9th Cir.1995)).) Defendants' argument that the Court will be required to make individual determinations of each class member's entitlement to restitution overlaps with predominance, which will be discussed below.

■ At this stage, Plaintiffs need not show that the class members have all questions of fact in common in order to satisfy commonality. *See Hanlon*, 150 F.3d at 1019. Plaintiffs can show commonality by "[t]he existence of shared legal issues with divergent factual predicates." *See id.* Plaintiffs present a number of common legal issues applicable to the class as a whole involving violations of the Fourth Amendment, procedural due process, and the Commerce Clause. Even though class members' claims could differ factually, these common issues are sufficient to meet the minimal requirements for commonality. *See id.* at 1019–20.

C. Typicality

■ Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under the rule's permissive standards, a plaintiff's claims need not be substantially identical, but only "reasonably co-extensive with those of absent class members." *Hanlon* 150 F.3d at 1020. "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992) (quoting *Schwartz*, 108 F.R.D. at 282). The court looks to "the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (internal quotation omitted). Typicality is "'satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal argument to prove the defendant's liability.'" *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir.2001) (quoting *Marisol v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997)).

■ Defendants argue that the typicality requirement is not satisfied, because neither of the named Plaintiffs are members of the proposed class (Doc. 92, pp.2–3). Defendants correctly assert that typicality requires that the named Plaintiffs be members of the class they represent. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). "Thus, one who is not a member of the defined class cannot serve as a representative plaintiff." (Doc. 92, 3:1–2).

■ The first class representative, Javier Torres ("Torres"), allegedly tried to send the proceeds that he received through the sale of an associate's car to the associate through Western Union, but the money was seized pursuant to Defendants' warrant (*Id.* at 4:5–7). Defendants argue that Torres is not a member of the class because "the funds he was sending were not his." (*Id.* at 4:16–18). However, the proposed class definition is not limited in scope to those who had an ownership interest in the seized money. Rather, the proposed class includes "[a]ll persons who attempted to send money through a wire transfer company." (Doc. 79, p.2). As a *sender* of money which was seized by Defendants, Torres is clearly typical of the proposed class of Plaintiffs. Torres attempted to send money through Western Union from a location outside of Arizona, and his fund transfers were intercepted and seized as a result of one of the warrants at issue in this case. The funds he attempted to send were intercepted which is what the class definition requires.

■ Defendants also argue that Lia Rivadeneyra ("Rivadenyra") is not a member of the class because (1) the seizure of Rivadeneyra's funds was never "completed," and (2) Rivadeneyra was not subject to a "blanket" seizure warrant (Doc. 92, pp.4–5). Defendants first assert that Rivadeneyra's funds were never seized by Defendants because the money is still within the control of Western Union (*Id.* at 4:21–26). On September 21, 2006, Defendants served the Sonora, Mexico warrant on Western Union. That warrant required Western Union to detain all money

transfers of $500 or more, sent by persons in any of 29 states and intended for receipt at 26 agency locations in Sonora, Mexico (Doc. 80, Ex. F). Due to that warrant, Rivadeneyra's attempt to wire funds to her brother in Sonora was interrupted, and her funds were placed into a detention account. Subsequently, Western Union filed a legal challenge to the Sonora warrant and seizures in state court, and the Maricopa County Superior Court entered a preliminary injunction against its continued execution and further violations of the U.S. Constitution (Doc. 80, Ex. K). As a result of the injunction, the funds remain in Western Union's possession and are being held pending the outcome of the State's appeal. While Defendants argue that Western Union's possession of the funds defeats typicality, the lawfulness of the seizures does not depend on the identity of the custodian of the funds. The custodian of the money is irrelevant to the question of whether Rivadeneyra falls within the class definition and is typical of the class as a whole. Rivadeneyra is a member of the class because she was allegedly subjected to a seizure of money initiated by Defendants.

Second, Defendants assert that Rivadeneyra was not subject to a "blanket" seizure warrant due to the Sonora warrant's inclusion of 26 specific Western Union locations. Defendants contend that there was probable cause to believe that money laundering was taking place at the Western Union location to which Rivadeneyra sent her money (Doc. 92, 5:12–16). However, whether there was probable cause to believe that money laundering was taking place is not relevant to the typicality inquiry. Rather, this is an issue that goes to the merits of the case itself.

Additionally, the class definition does not distinguish between those class members who attempted to send money to Arizona from those who attempted to send money to Sonora, Mexico because this difference in where the recipients of the funds were located has no bearing on the class claims. As stated by Plaintiffs, the classwide question is "whether . . . warrants, relying exclusively on generic factors drawn from extraordinarily broad profiles, were supported by probable cause." (Doc. 108, 5:14–15). The inclusion of the names of 26 Western Union locations in the Sonora warrant where Defendants anticipated the delivery of funds does not change the alleged lack of probable cause common to each of the six warrants. Plaintiffs still allege that the warrants at issue failed to provide any particularized information about the sender or intended recipient of the funds, including the failure to include a name, address, prior history of criminal activity, association with others known to engage in criminal activity, or information about the money transfers themselves (*Id.* at 5:8–12).

The named Plaintiffs' claims are typical of the rest of the class, because the allegations arise out of the constitutionality of the warrants at issue, and Defendants' actions with regard to those warrants. Although the amount of money seized from each class member may have been different, the typicality requirement is satisfied if the representative claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020. The alleged injuries arise from the same allegedly unconstitutional acts on the part of Defendants. Thus, the Court finds that the named Plaintiffs' claims are typical of the claims of the class as a whole.

### D. Adequacy of Representation

A plaintiff must also demonstrate that she "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The court must examine two issues: (1) whether the named plaintiff and her counsel have any conflicts of interest with other class members, and (2) whether the named plaintiff and her counsel will "prosecute the action vigorously on behalf of the class." *Hanlon,* 150 F.3d at 1020. In determining the latter issue, the court can consider the competency of counsel. *Id.* at 1021.

There is no evidence that the named Plaintiffs or their counsel will be subject to any conflict of interest with the rest of the class members. Defendants make no argument regarding any conflict of interest (*See generally,* Doc. 92), other than the assertion that the named Plaintiffs are not members of the proposed class, as already discussed. Plaintiffs demonstrate vigorous prosecution on behalf of the class by showing that class

658

counsel is competent. Defendants do not challenge the competence of class counsel, and the information submitted to this Court show counsel has extensive experience prosecuting many class actions suits. (*See* Doc. 80, Ex. L (showing Plaintiffs' counsel are experienced attorneys, and have extensive backgrounds in class action litigation).) Defendants presented no evidence to indicate any deficiencies or conflicts of interest on the part of class counsel. As such, the Court finds class counsel competent. *See Hanlon,* 150 F.3d at 1021 (finding class counsel competent when the opponents did not seriously challenge the issue and the counsel's record of experience dispelled any cause for concern). Thus, Plaintiffs have met their burden of showing they will vigorously prosecute the action on behalf of the class.

## II. RULE 23(b)(3)

In addition to meeting the requirements of Rule 23(a), Plaintiffs' class must satisfy the requirements of Rule 23(b). Here, Plaintiffs bring their suit under Rule 23(b)(3). This rule requires that the court find (1) that "questions of law or fact common to class members *predominate* over any questions affecting only individual members [*predominance* ]," and (2) that "a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy [*superiority* ]." Fed. R. Civ. P. 23(b)(3).

### A. Predominance

 Predominance tests the relationship between the common and individual issues. *Hanlon,* 150 F.3d at 1022. Assuming that a plaintiff has already established commonality, plaintiff's burden of proof to show predominance is "far more demanding" than commonality. *Amchem Prods.,* 521 U.S. at 624, 117 S.Ct. 2231. If the common questions do not predominate over the individual ones so that class certification is warranted, in appropriate cases, the district court can isolate the common issues and proceed with class treatment of those particular issues. *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996). The test has been satisfied when "a common nucleus of facts and potential legal remedies dominates this litigation." *Hanlon,* 150 F.3d at 1022.

Defendants present several questions that they argue require individualized determinations, and thus, defeat class certification. The issues necessitating individual assessments by the Court for each sender include: (1) the legal interest of senders in the property sent; (2) what types of notice of seizure and forfeiture were received by senders; and (3) which senders were chilled from making future money transactions (Doc. 92, 7:17–8:1).

### 1. Claims Under 42 U.S.C. § 1983

 Plaintiffs bring their claims pursuant to 42 U.S.C. § 1983 for violations of the Fourth Amendment, Fourteenth Amendment, and Commerce Clause. "Section 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir.2002). It does not create any substantive rights; instead, it is a means through which a plaintiff can challenge actions by government officials. To prove a case under section 1983, a plaintiff must show that "(1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." *Id.* (quoting *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].'" *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988) (quoting *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978)).

### a. Fourth Amendment

 In Count I of their Second Amended Complaint, Plaintiffs allege that Defendants' "blanket criteria-based seizures" of their funds were done without probable cause to believe that the funds were the fruits or instrumentalities of crimes, or subject to forfeiture under Arizona law (Doc. 141, Count I, ¶¶ 45–46). The Fourth Amendment, applied to the states through the Fourteenth Amendment's due process clause, protects people from "unreasonable searches

and seizures," and provides that "no Warrants shall issue, but upon probable cause ... and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. The Fourth Amendment demands that searches and seizures be reasonable which requires individualized suspicion of wrongdoing. *City of Indianapolis v. Edmond,* 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). As to this Fourth Amendment claim, Plaintiffs bear the burden of proving that their funds were seized by Defendants or their agents acting pursuant to Defendants' direction and authority without probable cause.

█ In Count II, Plaintiffs allege another Fourth Amendment violation, namely that Defendants' warrants were overbroad on their face (Doc. 141, Count II, ¶¶ 47–48). The scope of a warrant is limited by the extent of the probable cause. "[P]robable cause must exist to seize all the items of a particular type described in the warrant ... The concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant." *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d 847, 857 (9th Cir.1991) (citations omitted). For this claim, Plaintiffs must show that their funds were seized by Defendants or their agents who executed a warrant that was overbroad because the scope of the warrant exceeded the demonstrated probable cause.

Plaintiffs argue that questions of law or fact common to class members predominate over any questions affecting only individual members. Plaintiffs contend that all of the warrants utilized by Defendants contained the same characteristics, including authorizing the seizure of all funds sent (1) person-to-person, (2) from outside Arizona, (3) for delivery in Arizona or Sonora, Mexico, (4) in any amount at or over a certain threshold, (5) during a specified period (Doc. 80, 11:19–12:1). None of the warrants contained any particularized information about any sender or receiver of the funds (*Id.* at 11:19–21). According to Plaintiffs, the shared characteristics between the six warrants are the subject of the class claims and make certification appropriate. The Court finds that there are several common legal questions that could be resolved on a class-wide basis, including (1)

whether the seizures pursuant to Defendants' warrants lacked probable cause; (2) whether the warrants were based on individualized suspicion sufficient to support a Fourth Amendment seizure; and (3) whether the warrants were overbroad on their face.

Despite these common questions, the probable cause determination for each warrant will be predicated on individual issues. For each of the six warrants, the probable cause determination was based on different evidence that was presented to the state court (Doc. 87, Ex. 1–6; Tr. 63:18–65:20; Tr. PM 54:4–21). This evidence includes Western Union's transmission data, ledgers of completed wire transactions obtained from stash houses, confidential informants, intercepted phone calls, cooperative suspects, and statistical analysis (*Id.*). Over time, the analysis further evolved as the coyotes adapted their operations to use Western Union locations in Mexico instead of Arizona (Tr. PM 54:4–21). Additional facts were added with each new warrant or modification to an existing warrant (*Id.*). These differences between warrants would involve the Court in deciding whether there was probable cause for each individual warrant and subsequent modification based upon the information presented to the state court by Defendants. These individualized determinations will predominate over the common questions presented by Plaintiffs' Fourth Amendment claims, and thus, the predominance requirement of Rule 23(b)(3) is not satisfied.

b. Fourteenth Amendment

█ In Count III of their Complaint, Plaintiff allege that Defendants failed to give Plaintiffs and proposed class members adequate and timely notice of the seizure and forfeiture of their funds (Doc. 141, Count III, ¶¶ 49–53). Defendants allegedly also have deprived Plaintiffs and class members of a post-seizure hearing to contest the seizures and forfeitures (*Id.*).

█ A procedural due process claim has two elements: (1) deprivation of a constitutionally protected liberty or property interest and (2) denial of adequate procedural protections. *See McQuillion v. Duncan,* 306 F.3d 895, 900 (9th Cir.2002); *Wright v. Riveland,* 219 F.3d 905, 913 (9th Cir.2000). A due process violation occurs when notice of a

seizure is not provided or is not timely and adequately provided. *See Jones v. Flowers,* 547 U.S. 220, 226, 229, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006) (outlining requirements of constitutionally required notice when property is seized by government). To prevail, Plaintiffs must show that Defendants' seizure of their funds sent through Western Union deprived them of a constitutionally-protected property interest without due process of law.

Plaintiffs claim that to satisfy Due Process, class members were entitled to two forms of notice so that they could reasonably exercise their constitutional right to a hearing: (1) notice that their funds had been *seized,* and what they could do to challenge the seizure; and (2) notice of pending *forfeiture,* including notice of the initiation of forfeiture proceedings and of the opportunity to show cause by a date certain why forfeiture of their property should not be decreed (Doc. 151, 7:14–19). Although Plaintiffs initially contested both seizure and forfeiture notice, they stated in their supplemental briefing that they were withdrawing their request for class certification as it related to notice of *seizure (Id.* at 8:3–9). Instead, Plaintiffs would only litigate their due process claim as to Defendants' failure to provide notice of *pending forfeiture* on a class-wide basis *(Id.).*

As to this narrower due process claim of forfeiture notice, Defendants admit that they had a policy and practice to forgo sending written notice of seizure or pending forfeiture to the senders of electronic funds transfers that were seized (i.e., class members) (Doc. 145, Answer ¶¶ 20, 38; Doc. 80, Ex. I, Kelly Aff.). Defendants believed that senders of the transfers were not owners or interest holders in the funds at the time of seizure *(Id.).* Despite this lack of written notice, Defendants claim that many members of the class received actual notice that their funds had been seized and what legal procedures could be pursued to contest the seizure and/or forfeiture of their funds *(Id.).* Furthermore, Defendants argue that the notice received by each sender, if any, will have to be assessed by the Court on an individual basis (Doc. 92, pp. 15–16). For each sender,

the Court would need to determine the contact information available, what notice was reasonably designed to apprise them, and what notice was actually received *(Id.* at 16). In their Reply, Plaintiffs argue that if such individualized inquiries were required, the certification of any class challenging the adequacy of notice would be precluded where class members had other sources of information (Doc. 108, 13:21-24). Such a position cannot be reconciled, according to Plaintiffs, with those cases where courts have certified class actions based on inadequate notice claims *(Id.* at 13:24–26). In particular, Plaintiffs point to *Walters v. Reno* in which the Ninth Circuit reviewed the certification of a class-wide due process notice claim. 145 F.3d 1032 (9th Cir.1998).

▮ There are certainly common, class-wide questions as it relates to Plaintiffs' due process claims. Whether the determination that class members had no cognizable property interest in the seized funds was valid is a class-wide question, as is the related question of whether the failure to provide written notice of forfeiture violated due process. However, the Court finds that individual issues of determining which class members were provided adequate notice predominates over these common questions. "A putative claimant's actual knowledge of a forfeiture proceeding can defeat a subsequent due process challenge, even if the government botches its obligation to furnish him with notice." *United States v. One Star Class Sloop Sailboat,* 458 F.3d 16, 22 (1st Cir.2006). The question of whether an interested party has been provided constitutionally adequate notice by the government before effecting a forfeiture requires a case-by-case inquiry. As Defendants point out, there are a myriad of ways that senders may have received actual notice. For example, senders could have learned of the seizure from receivers, who were sent written notice by Defendants (Doc. 92, 15:22–25). Some senders called the Arizona Financial Crimes Task Force call center and were informed by law enforcement that their transaction had been seized and could be subject to forfeiture *(Id.* at 15:26–16:1).[5]

---

**5.** Department of Public Safety investigator Dan Kelly testified that when a wire matching the criteria of a seizure warrant was sent, the wire was diverted to a holding cue handled by a select

group of Western Union operators in Missouri (Tr. 81:15–82:5). When the receiver tried to obtain the money transferred by the sender, the wire was not available for payout (Tr. 82:6–16).

Still others may have received notice through publication in the Arizona Business Gazette (*Id.* at 15:22–25). Even among those senders that received actual notice, the content of that notice may have varied. Dan Kelly testified that he informed senders that their money had been seized by the state of Arizona and may be subject to forfeiture (Tr. 90:4–9; 91:6–9; 108:1–109:4). However, there was no standardized language used by all call center operators, and thus, the particular notice given may have varied between senders.

■ In addition to whether class members received actual notice, the Court will have to determine on an individual basis what contact information was available for each class member. " 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *United States v. Ritchie*, 342 F.3d 903, 910 (9th Cir.2003) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* (quoting *Mullane*, 339 U.S. at 315, 70 S.Ct. 652). "Assessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected by the Fourteenth Amendment.' " *Flowers*, 547 U.S. at 229, 126 S.Ct. 1708 (quoting *Mullane*, 339 U.S. at 314, 70 S.Ct. 652). As Defendants point out, many of the individuals who use Western Union for the purposes of human and drug smuggling supply false names and addresses to the agents (Doc. 92, 16:13–15). The use of false identities means that the information available to Defendants may not have been accurate, even if notice was sent out to some senders. Defendants might

not be liable for failing to provide personal notice to such individuals. The Court would need to determine the contact information available for each class member, what notice was reasonably designed to apprise them of the forfeiture, and what notice, if any, was actually received by them.

*Walters v. Reno*, relied upon by Plaintiffs, is distinguishable. In *Walters*, a group of aliens brought an action against the Immigration and Naturalization Service ("INS") alleging that they had been denied due process when they were given inadequate notice of deportation proceedings following charges of document fraud. 145 F.3d at 1037–39. In arguing for class certification, the class members raised a common constitutional question as to "whether the nationwide procedures used by INS in document fraud proceedings sufficiently apprise aliens of their constitutional right to a hearing, thereby satisfying the notice component of due process." *Id.* at 1045. In opposition, the government contended that the experiences of class members were not sufficiently similar because individual INS agents and branch offices had disregarded the agency's official policy and instituted their own procedures. *Id.* Thus, some class members may have received adequate notice of the deportation proceedings despite constitutionally deficient official notice procedures. *Id.* In rejecting the government's argument and finding commonality, the Ninth Circuit stated,

> We think the government misses the point. There is nothing wrong with the district court's presumption that the INS actually employed its constitutionally deficient policies and procedures. The government made no showing in the district court that its procedures were modified by more than just a few agents and branch offices. Thus, it is reasonable to presume that class members involved in document fraud proceedings did not receive due process because of the inadequate forms. Moreover,

---

If the sender or receiver contacted the Western Union location where the money was sent, they would be given a 1–800 number to Missouri (Tr. 82:21–24). The Western Union operators would inform the complaining caller, whether a sender or receiver, that the money had been seized by the state of Arizona (Tr. 83:1–4) The Western Union operators also would ask for a phone

number, which was forwarded to the call center (Tr. 83:4–6). A detective from the call center later would contact the complaining person (Tr. 83:7–9). This was the process for sweeps 11, 12, 13, and 15. With sweep 21, the Sonora Warrant, Western Union was instructed to give senders a prepared document that provided notice that the wires had been seized (Tr. 84:7–12).

as the district court observed, it would be "a twisted result" to permit an administrative agency to avoid nationwide litigation that challenges the constitutionality of its general practices simply by pointing to minor variations in procedure among branch offices and individual INS agents[.] *Id.* at 1046. Unlike in *Walters* where the differences in procedures were "minor variations" and included only a handful of agents and one or two branch offices, the differences here are much greater. While Defendants had a general policy of not sending written notice to senders, there were many ways that senders may have received actual notice. These methods included talking to receivers, contacting the call center, and through the Arizona Business Gazette. Even where such notice was given, there were likely variations in its content.

### c. Commerce Clause

■ The Commerce Clause grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8. To determine whether a state regulation violates the so-called "dormant" Commerce Clause, the Supreme Court has adopted a dual framework. A state law that discriminates against interstate commerce is "virtually *per se* invalid," and will survive only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008) (citations omitted). Where a law does not discriminate against interstate commerce but burdens it indirectly, the court employs a balancing test. *Id.* Under this test, the law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Davis,* 128 S.Ct. at 1808 (quoting *Pike v. Bruce Church,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). The Commerce Clause also limits the power of states to discriminate against foreign commerce. U.S. Const. Art. I, § 8. The dormant foreign Commerce Clause serves to preserve federal uniformity in the arena of foreign commerce. *Wardair Canada, Inc. v. Fla. Dep't of Revenue,* 477 U.S. 1, 7–8, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Id.* at 8, 106 S.Ct. 2369 (citations omitted).

■ In their Second Amended Complaint, Plaintiffs allege that the seizure of their funds by Defendants constitute an unconstitutional interference with interstate or foreign commerce (Doc. 141, Count IV, ¶¶ 54–58). *See Edgar v. MITE Corp.,* 457 U.S. 624, 642, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (" '[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power' ") (quoting *Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

The parties only briefly addressed the commerce clause claim in their briefing and at the evidentiary hearing. Despite the lack of argument, Plaintiffs still have the burden of demonstrating that the Rule 23 requirements are satisfied before a class can be certified. *See Doninger,* 564 F.2d at 1308 (party seeking class certification bears the burden of showing that each element of Rule 23 is satisfied). In their Motion for Class Certification, Plaintiffs assert that a common question exists regarding whether the seizure of Plaintiffs' funds imposes undue burdens on or interferes with interstate or foreign commerce in violation of the Commerce Clause (Doc. 80, 9:20–22; 11:16–19). Plaintiffs have failed to show that this common question will predominate over the individual issues previously discussed. The warrants targeted funds sent from many different states and thus, competing state interests may be involved. Additionally, the foreign commerce claim would only apply to the Sonora warrant since none of the other warrants involved funds sent to a foreign country.

### 2. Restitution Demand

■ In opposing certification, Defendants argue that the Court will have to assess each senders' legal interest in the seized and/or forfeited funds (Doc. 92, 9:6–10). Defendants claim that Plaintiffs could be barred from restitution of seized funds, even if that sei-

zure was unconstitutional, if the funds were being sent in furtherance of an illegal activity (*Id.* at 10). Individualized determinations by the Court of the purpose that each sender's funds were sent through Western Union would be required before class membership could be ascertained (*Id.* at 12–15).

■■■■■ In their Second Amended Complaint, Plaintiff seeks restitution of the funds seized under the six warrants (Doc. 141, 13:10–11) (Plaintiffs request that the Court "award restitution to plaintiffs and members of plaintiff class for the monies wrongfully seized from them by defendants"). Well-established law holds that a party to an illegal contract cannot have his illegal objects carried out. *See e.g.*, *United Bank & Trust Co. v. Joyner*, 40 Ariz. 229, 236, 11 P.2d 829, 832 (1932) ("[T]he general law is that a party to an illegal contract cannot come into court and ask to have his illegal objects carried out"); *White v. Mattox*, 127 Ariz. 181, 184, 619 P.2d 9, 12 (1980) (recovery under a contract will be denied if the acts to be performed by the contract are themselves illegal or against public policy). Courts will not aid those whose cause of action is founded on an illegal act, and thus, the courts will not provide return of funds that a sender believed was being paid pursuant to an illegal contract. A court may not assist either party to enforce an illegal contract. *See e.g.*, *Jamison v. S. States Life Ins. Co.*, 3 Ariz.App. 131, 135–36, 412 P.2d 306, 310–11 (Ct.App.1966) (contract to make mortgage loans in violation of state statute not enforceable); *Nat'l Union Indem. Co. v. Bruce Bros.*, 44 Ariz. 454, 38 P.2d 648 (1934).

Although Plaintiffs claim that the seizure of their funds by Defendants violated the Fourth Amendment, such violations may not entitle Plaintiffs to restitution if the monies was sent for illegal purposes. At the evidentiary hearing, there was testimony regarding admissions by senders that the money was involved in criminal activity. Investigator Dan Kelly of the Arizona Department of Public Safety testified that some senders admitted that the wire was sent to a coyote to bring a friend or relative into the United States (Tr. PM 9:8-14). Additionally, many callers, while not admitting directly the illegal purpose of their sent funds, told suspicious stories to the law enforcement operating the call center. For example, individuals would send a large wire representing a significant portion of their income to someone they didn't know and didn't have a way to contact (Tr. 91:17–92:6). Another common pattern was what witness Dan Kelly referred at the evidentiary hearing to as the "car story." A person in Illinois, for example, would wire $2,000 to someone in Arizona to purchase a car from this person (Tr. 92:8–15). The caller, however, would not be able to provide the phone number of the individual in Arizona, the type of vehicle, or its license plate (Tr. 92:16–25; 93:16–18).

Furthermore, logs from the call center operated by the Arizona Financial Crimes Task Force contain admissions from senders that they were wiring money to facilitate drug trafficking and illegal human smuggling (Doc. 149, 7:1–5; Ex. A). Examples of such admissions include: "the sender admitted the money was for payment o[f] a coyote to bring her brother in law from Mexico" (Ex. A, Torres/DPS 053996); "S admitted he sent money to coyote and was told to use coyote name" (Torres/DPS 054002); "admits $ is to pay coyote" (Torres/DPS 054004); "sender says he was asked by coyotes to send money for the transportation of his wife" (Torres/DPS 054022); "sender admitted that the money was sent to smuggle a relative" (Torres/DPS 054054). These and other admissions like them show that a substantial number of the proposed class members likely sent their money for illegal purposes. In order to decide which class members has a restitution claim, the Court would have to do an individual analysis of the thousands of transactions to ascertain the reasons each was sent.

As Plaintiffs have failed to show that any of their claims satisfy Rule 23(b)(3)'s requirement of predominance, the Court need not reach the question of whether a class action is a superior method of adjudication for the claims.

### III. Western Union Decision

While the present motion for class certification was pending, the Arizona Supreme Court issued a decision in *State of Arizona v. Western Union Financial Services. W. Un-*

*ion*, 220 Ariz. at 568, 208 P.3d at 219. In reliance upon that decision, Plaintiffs requests certain relief from the Court including (1) certification of a subclass based upon the Sonora warrant and an entry of judgment in favor of that subclass and (2) the grant of class certification with respect to the remaining class members (Doc. 173, 2:4–6). However, the *Western Union* decision addressed an issue of substantive due process, namely whether the Arizona state courts, consistent with the U.S. Constitution's substantive due process clause, could exercise in rem jurisdiction over money transfers that originated outside Arizona and were directed to Sonora, Mexico. 220 Ariz. at 569–70, 576, 208 P.3d at 220–21, 227. Plaintiffs' complaint, in contrast, only addressed procedural due process concerns, including Defendants' alleged failure to provide adequate notice of seizures and prompt and adequate post-seizure hearings (Doc. 141, Compl. Count III (due process claim)). Thus, the *Western Union* decision is not directly applicable to Plaintiffs' class certification motion.

## CONCLUSION

After a rigorous analysis, the Court is not satisfied that Plaintiffs have set forth sufficient facts in order to certify a class under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs cannot demonstrate that common questions predominate over any questions affecting only individual members because individualized issues exist such as the purpose for which the funds were sent, the probable cause for each warrant, and the types of notice class members received. As Plaintiffs have not shown that the proposed class is sufficiently cohesive to meet Rule 23(b)(3), the Court denies Plaintiffs' motion for class certification.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification (Doc. 79), is **DENIED**.